**PLAYBOY ENTERPRISES, INC., and Puerto Rico Cable Television Association, on its own behalf and on behalf of its members, Plaintiffs,**

**v.**

**PUBLIC SERVICE COMMISSION OF PUERTO RICO; Angel Almodovar Correa; Ruben Villalba Olivo; Jose Cima de Villa; Maria Cancel Alegria; Ruben Rivera Garcia; Hon. Hector Rivera Cruz, Secretary of Justice of Puerto Rico, and Angel E. Rosa Rosa, Defendants.**

Civ. No. 87–0611 (JP).

United States District Court,
D. Puerto Rico.

Oct. 31, 1988.

---

David W. Ogden, Donald B. Verrilli, Jr., Bruce J. Ennis, Ennis Friedman & Bersoff, Washington, D.C., Howard Shapiro, Burton Joseph, Playboy Enterprises, Inc., Chicago, Ill., Maria Emilia Picó, Erick G. Negrón, Rexach & Pico, Hato Rey, P.R., for Puerto Rico Cable Television Ass'n, Playboy Enterprises, Inc. and Playboy Programming Distribution Co. of America.

Carlos Del Valle, Ramirez & Ramirez, Hato Rey, P.R., for Public Service Com'n of the Commonwealth of P.R., Angel Almodovar Correa, Ruben Villalba Olivo, Jose Cima De Villa, Maria Cancel Alegria, Ruben Rivera Garcia and Hector Rivera Cruz.

Bruce A. Taylor, Scottsdale, Ariz., José A. Andreu García, Andreu García & Andreu García, Hato Rey, P.R., for Angel E. Rosa Rosa.

## OPINION AND ORDER

PIERAS, District Judge.

On September 30, 1986, the Legislature of Puerto Rico passed Act Number 3 of the Seventh Special Session of the Tenth Legislature of the Commonwealth of Puerto Rico. Act No. 3 amended the Penal Code of Puerto Rico by extending coverage of the definitions of "obscene material" and "distribution of obscene material" to include depictions and transmissions via cable television. Transmission of obscene material was made punishable by up to four years' imprisonment, and a $50,000.00 fine, depending on whether there were repeated violations and aggravating circumstances.

Subsequent to the passage of Act No. 3, the Commission issued "Agreement Number 2," in which the Commission adopted, on the administrative level, the prohibitions enacted by the Legislature. The Commission, having franchising authority over ca-

ble television operators in Puerto Rico, set forth the possible sanctions for violation of the anti-obscenity statute. These sanctions were suspension or revocation of the franchise license and fines.

In late March, 1987, a prosecutor of the Department of Justice of the Commonwealth of Puerto Rico, defendant Rosa, contacted individual cable operators around Puerto Rico to inform them that he was preparing to file criminal complaints against them and their companies alleging transmission of obscene material over their respective cable systems. In the face of impending criminal obscenity charges, several cable operators terminated their contracts with the appropriate subsidiary of PEI and discontinued carriage of The Playboy Channel. This lawsuit followed.

Plaintiffs in this case are Playboy Enterprises, Inc. (PEI), the Playboy Programming Distribution Corporation (PPDC), and the Puerto Rico Cable Television Association (PRCTA). Defendants are the individual members of the Public Service Commission (PSC) of Puerto Rico in their official capacities, the Secretary of Justice of Puerto Rico, and a prosecutor from the Justice Department, Angel Rosa Rosa. The suit seeks relief against the Commission and the Justice Department to declare Act No. 3 unconstitutional, to enjoin criminal prosecution under the statute, and to enjoin the Commission from suspending or revoking the franchise of any cable operator both on constitutional grounds and on the grounds that local criminal prosecution of cable operators is preempted by the Cable Communications Policy Act (CCPA) of 1984, 47 U.S.C. §§ 521–559. The suit also seeks damages related to the claim that certain cable operators and PEI as well as PPDC suffered losses after discontinuing carriage of the Playboy Channel in the face of the prosecutor's threats of criminal prosecution. By agreement of the parties and with the consent of the Court, these legal claims have been held in abeyance during the pendency of the equitable claims.

## I. VIABILITY OF SUIT UNDER 42 U.S.C. § 1983

Plaintiffs claim that this Court has jurisdiction under the civil rights statute, 42 U.S.C. § 1983, to determine whether the Cable Communications Policy Act of 1984 preempts local obscenity prosecution of members of plaintiff PRTCA for cablecast of The Playboy Channel. Defendants have raised several jurisdictional and standing issues that must be resolved before proceeding to the merits of the case. Defendants argue first that as a result of a consent decree in this action, no case or controversy exists that would enable this Court to exercise its power under Article III of the United States Constitution. In the alternative, defendants argue that the Cable Communications Policy Act of 1984 provides no implied cause of action or substantial right that 42 U.S.C. § 1983 would protect. The Court finds both of these arguments unconvincing.

### A. Mootness

■ The Court entered a consent decree in this case which was intended to be interim protection until the case was decided on its merits. Part of that consent decree was a permanent injunction that defendants were enjoined from

a) Revoking or suspending, or threatening to revoke or suspend, the franchise licenses of cable operator members of coplaintiff Puerto Rico Cable Television Association, or imposing, or threatening to impose, any other administrative sanctions based upon any video programming carried on The Playboy Channel; provided, that nothing in this paragraph shall be construed to enjoin the Public Service Commission or the Public Service Commissioners from enacting, implementing, and enforcing regulations promulgated after the date of this Order concerning the transmission on cable television systems of video programming, not excluding The Playboy Channel, that is obscene or otherwise unprotected by the Constitution, so long as those regulations and any action taken pursuant to those regulations are permitted by the Constitution of the United States and applicable law; and it is further provided that said regulations will not be enforced against members of coplaintiff Puerto Rico Cable

Television Association or their agents, employees, or representatives, for a period of thirty (30) days following formal adoption and notification to all affected parties, and that plaintiffs may during that thirty (30) day period or thereafter seek declaratory or injunctive relief within the proceedings before this Court, or otherwise, respecting the validity and enforceability of said regulations;

b) Threatening to indict or otherwise threatening to initiate prosecutions against cable operator members of coplaintiff Puerto Rico Cable Television Association, or any of their agents, employees, and representatives, based upon any video programming carried on The Playboy Channel; or indicting or otherwise initiating prosecutions, or taking any administrative or civil actions against plaintiffs or any cable operator members of coplaintiff Puerto Rico Cable Television Association or their agents, representatives or employees, in whole or in part in reprisal or as a penalty for the exercise of First Amendment rights, including the right to file the instant lawsuit or to transmit constitutionally protected material; provided that the foregoing clause shall not be interpreted to prohibit the Secretary of Justice from instituting any criminal prosecution against plaintiff Playboy Programming Distribution Company, Inc., for programming distributed on The Playboy Channel in Puerto Rico after the date of this Order that the Secretary of Justice believes in good faith is in fact obscene, so long as such prosecution is not brought in reprisal or as a penalty for the exercise of constitutionally protected rights;

c) Indicting or initiating any prosecution of or taking any administrative or civil action against cable operator members of coplaintiff Puerto Rico Cable Television Association or any other person or entity for any video programming on The Playboy Channel carried prior to the date of this Order; and

d) Otherwise intentionally interfering with any video programming carried on The Playboy Channel by cable operator members of coplaintiff Puerto Rico Cable

Television Association by intimidation of or putting coercive pressure upon said operators.

Defendants now argue that, as a result of the permanent injunction portion of the consent decree, the controversy is moot. There is no real and immediate injury to be enjoined because, defendants contend, the only possible injury, threatened prosecution, has already been permanently enjoined.

Defendants rely primarily on *City of Los Angeles v. Lyons,* 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983). Respondent in that case sought to enjoin the future use by the Los Angeles Police Department (LAPD) of a "chokehold" during arrests. The respondent charged that the chokehold had resulted in injury to himself and death to some. Lyons, as part of the complaint, sought injunctive relief. The United States Supreme Court held that "Lyons had failed to demonstrate a case or controversy ... that would justify the equitable relief sought." 461 U.S. at 105, 103 S.Ct. at 1667 (footnote omitted). The Court continued:

> In order to establish an actual controversy in this case, Lyons would have had not only to allege that he would have another encounter with the police but also to make the incredible assertion either, (1) that *all* police officers in Los Angeles *always* choke any citizen with whom they happen to have an encounter, whether for the purpose of arrest, issuing a citation, or for questioning, or (2) that the City ordered or authorized police officers to act in such manner.

*Id.* at 105–106, 103 S.Ct. at 1667. The Supreme Court thereby emphasized the difficulty of regulating future conduct that may not come to pass.

Defendants in this case misread the consent decree. Although it permanently enjoins defendants from threatening prosecution and from prosecuting for any programming shown by plaintiffs *prior* to the entry of the consent decree, the injunction specifically states that nothing prohibits

> the Secretary of Justice from instituting any criminal proceeding against plaintiff Playboy Programming Distribution Com-

pany, Inc., for programming distributed on The Playboy Channel in Puerto Rico *after the date of this Order.* (emphasis supplied)

The permanent portion of this injunction is silent as to enjoining all prosecution of individual members of the PRTCA. Rather, the injunction against prosecution of individual members of the PRTCA is explicitly preliminary in nature. Defendants are permanently enjoined only from "threatening" prosecution, not from actually carrying it out. Defendant is attempting to bootstrap the permanency of the injunction against threats of prosecution into an apparent bar on prosecution. An absolute bar would moot this case but that bar is not yet in place. Defendants are attempting to evade review of their prosecution under Law 3 by acquiesing to an injunction against certain verbal acts that may accompany prosecution. The United States Supreme Court has recently noted that, in cases where defendant attempts to avoid appellate review by voluntarily ceasing the challenged conduct without losing the ability to reinitiate the conduct once the mooted case is dismissed—

> [t]his Court has ruled that "[m]ere cessation of allegedly illegal conduct does not moot a case; if it did, the courts would be compelled to leave '[T]he defendant ... free to return to his own ways.'"

*Deakins v. Monaghan,* — U.S. —, 108 S.Ct. 523, 529 n. 4, 98 L.Ed.2d 529, 539 n. 4 (1988), *quoting United States v. Phosphate Export Association,* 393 U.S. 199, 203, 89 S.Ct. 361, 364, 21 L.Ed.2d 344 (1968), *in turn quoting United States v. W.T. Grant Co.,* 345 U.S. 629, 632, 73 S.Ct. 894, 97 L.Ed. 1303 (1953). The case at bar is analogous. Although defendants may forever be prohibited from murmuring darkly to plaintiffs about the strains that an incipient prosecution may cause, should the Court dismiss the declaratory and injunctive claim as moot on account of defendants' silence, nothing would prevent defendants from tacitly engaging in the allegedly illegal conduct of swearing out a criminal complaint. Defendants have in fact ceased only part of the challenged conduct.

This analysis assumes, of course, that there is a real and immediate fear of prosecution against plaintiffs. In this regard *Lyons* is not the applicable standard. Mr. Justice White's conjectures about future meetings between Lyons and members of the Los Angeles Police Department as well as the actions that officers would take upon such a meeting differ graphically from the stipulated facts of this case.

The parties stipulated that in late March, 1987, defendant Rosa contacted individual members of defendant PRTCA. The gist of defendant Rosa's communication was that he was about to initiate prosecution under the newly adopted extensions to the Puerto Rico anti-obscenity statute. The object of defendant Rosa's prosecution was carriage of The Playboy Channel. To that end, defendant Rosa subpoenaed Héctor R. González, president of Teleponce Corporation, to appear before defendant Rosa at the Criminal Division of the Commonwealth Department of Justice. Two other members of PRCTA sent letters to the chairman of the Public Service Commission, defendant Almodóvar Correa. These letters indicated the cable operators' intent to discontinue cablecast of The Playboy Channel. Although the chairman never responded to these letters, defendant Rosa shortly thereafter informed officers of these cable operators that Rosa knew of their intent to drop The Playboy Channel and that the contemplated prosecution against them was likewise being dropped. The parties have stipulated that Teleponce, the sole surviving cablecaster of The Playboy Channel, had a reasonable fear of prosecution under Law No. 3 when this case was filed and the temporary restraining order issued.

In examining the immediacy and reality of this controversy, the Court is guided not by *Lyons,* but by *Steffel v. Thompson,* 415 U.S. 452, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974). Petitioner Steffel sought in the United States District Court for the Northern District of Georgia a declaratory judgment that a Georgia trespassing statute was being applied against him in violation of the first and fourteenth amendments to the United States Constitution. Steffel had

been distributing at a shopping center handbills critical of American involvement in the Vietnam War. After Steffel declined to cease pamphleteering when asked by shopping center employees, police were summoned. In the face of the threat of arrest, Steffel left. On a subsequent occasion, Steffel returned with a companion. Steffel and his companion were again warned by the police. Steffel left; his companion did not and was arrested for criminal trespass. *Id.* at 458–460, 94 S.Ct. at 1215–1216.

The High Court first addressed the question of whether an actual case or controversy existed that was amenable to review. The Supreme Court held that even absent a pending criminal proceeding, a federal plaintiff demonstrating a genuine threat of enforcement of a disputed state criminal statute may seek declaratory relief. *Id.* at 461–462, 475, 94 S.Ct. at 1216–1217, 1223.

In *Steffel*, the Supreme Court was examining whether such declaratory relief would be proper for a constitutional challenge to a state criminal statute. In the case at bar, plaintiffs have facially attacked the constitutionality of Law No. 3 as violative of the first amendment. For this alleged violation plaintiffs seek injunctive relief. Plaintiffs further seek declaratory relief that the Cable Communications Policy Act of 1984 preempts Law No. 3. This is also a constitutional claim.

Article VI of the United States Constitution provides:

> This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound

thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

Where Congress properly exercises its constitutional power, any contrary state law must yield: it is preempted. *Gibbons v. Ogden,* 22 U.S. (9 Wheat.) 1, 6 L.Ed. 23 (1824) (New York state law awarding exclusive franchise for ferry traffic between New York City and Elizabethtown, New Jersey, preempted by congressional power to regulate interstate commerce).[1]

Section 638 of the Cable Communications Policy Act of 1984 provides:

> *Criminal and civil liability*
>
> Nothing in this subchapter shall be deemed to affect the criminal or civil liability of cable programmers or cable operators pursuant to the Federal, State, or local law of libel, slander, obscenity, incitement, invasions of privacy, false or misleading advertising, or other similar laws, except that cable operators shall not incur any such liability for any program carried on any channel designated for public, educational, governmental use or on any other channel obtained under section 532 of this title [§ 612 of the Act] or under similar arrangements.

47 U.S.C. § 558.

Section 612 of the Cable Communications Policy Act, 47 U.S.C. § 532, in turn provides for commercial use of cable channels by persons unaffiliated with the cable operator. The section sets forth detailed policies and procedures whereby commercial entities unaffiliated with the cable operator may gain access to cable systems. Section 612(b)(1), 47 U.S.C. § 532(b)(1), sets the amount of cable channel capacity that must be set aside for persons unaffiliated with the cable operator.[2] Section 612(c), 47 U.S.

---

**1.** The term "preemption" was not used by the Court in *Gibbons v. Ogden.*

**2.** **Designation of channel capacity for commercial use:**

(1) A cable operator shall designate channel capacity for commercial use by persons unaffiliated with the operator in accordance with the following requirements:

(A) An operator of any cable system with 36 or more (but not more than 54) activated channels shall designate 10 percent of such

channels which are not otherwise required for use (or the use of which is not prohibited) by Federal law or regulation.

(B) An operator of any cable system with 55 or more (but not more than 100) activated channels shall designate 15 percent of such channels which are not otherwise required for use (or the use of which is not prohibited) by Federal law or regulation.

C. § 532(c), ordains the commercial relationship between the cable operator and the unaffiliated cable programming provider.[3] It is undisputed that at least one member of the PRCTA, Teleponce, has a sufficient cable channel capacity, 36 channels, to make it fall under section 612(b)(1)(A), 47 U.S.C. § 532(b)(1)(A). Teleponce is the last cable system in Puerto Rico to continue broadcasting The Playboy Channel. The effect of coming under section 612(b), 47 U.S.C. § 532(b), is that any unaffiliated commercial cable programmer may demand access to any qualifying cable system. That access must then be provided by the cable operator under reasonable terms and conditions. This required access is available to any unaffiliated commercial cable programmer up to the point where the mandated access percentage of the cable system's capacity is filled.

Once such statutorily mandated access is obtained, the cable operator loses editorial control over the video programming provided by the unaffiliated commercial cable programmer. CCPA § 612(c)(2), 47 U.S.C. § 532(c)(2). Another consequence for the statutorily mandated access is—

> that cable operators shall not incur any such liability for any program carried on any channel designated for public, educational, governmental use or on any other channel obtained under section 532 of this title or under similar arrangements.

Cable Communications Policy Act § 638, 47 U.S.C. § 558.

Plaintiffs aver that The Playboy Channel is being shown on the cable system of a PRCTA member pursuant to section 638 of the Cable Communications Policy Act, 47 U.S.C. § 558. Plaintiffs contend that they are entitled to a declaratory judgment that section 638 preempts local prosecution of cable operators for programming carried on a section 612 channel. Again, this is a constitutional attack.

The Court does not yet reach this question at this stage of this Opinion and Order, for there are still jurisdictional and standing questions to be resolved. The Court only holds at this juncture that plaintiffs' claims of fear of prosecution are more *Steffel*-like than *Lyons*-like. It is beyond cavil that communications by a Puerto Rico prosecutor, both in threatening prosecution and in dropping prosecution after somehow becoming cognizant that certain individual members of the PRCTA would discontinue cablecast of The Playboy Channel, represent a very real, and very fearsome, possibility of prosecution. These are not the "incredible assertions" of *Lyons*, 461 U.S. at 105–106, 103 S.Ct. at 1666–1667. Rather, the actions of the Puerto Rico prosecutor are "ample demonstration that [plaintiffs'] concern with [prosecution] has not been 'chimerical.'" *Steffel*, 415 U.S. at

(C) An operator of any cable system with more than 100 activated channels shall designate 15 percent of all such channels.
(D) An operator of any cable system with fewer than 36 activated channels shall not be required to designate channel capacity for commercial use by persons unaffiliated with the operator, unless the cable system is required to provide such channel capacity under the terms of a franchise in effect on October 30, 1984.
(E) An operator of any cable system in operation on October 30, 1984, shall not be required to remove any service actually being provided on July 1, 1984, in order to comply with this section, but shall make channel capacity available for commercial use as such capacity becomes available until such time as the cable operator is in full compliance with this section.
47 U.S.C. § 532(b)(1).

3. (c) **Use of channel capacity by unaffiliated persons; editorial control; restriction on service:**
(1) If a person unaffiliated with the cable operator seeks to use channel capacity designated pursuant to subsection (b) of this section for commercial use, the cable operator shall establish, consistent with the purpose of this section, the price, terms and conditions of such use which are at least sufficient to assure that such use will not adversely affect the operation, financial condition, or market development of the cable system.
(2) A cable operator shall not exercise any editorial control over any video programming provided pursuant to this section, or in any other way consider the content of such programming, except that an operator may consider such content to the minimum extent necessary to establish a reasonable price for the commercial use of designated channel capacity by an unaffiliated person.
47 U.S.C. § 532(c).

459, 94 S.Ct. at 1215, *citing Poe v. Ullman,* 367 U.S. 497, 508, 81 S.Ct. 1752, 1758, 6 L.Ed.2d 989 (1961). This controversy is not moot.

### B. *Right of Action Under Section 1983*

■ Defendants also contend that The Cable Communications Policy Act of 1984 provides no implied cause of action or substantial right that the civil rights statute, 42 U.S.C. § 1983, would protect. The availability of section 1983 to enjoin violations of federal statutes by state agents is generally recognized. *Maine v. Thiboutot,* 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980). In *Thiboutot,* the State of Maine and the Maine Commissioner of Human Services recomputed Thiboutot's benefits under the Aid to Families with Dependant Children (AFDC) program. The recomputation was not in Thiboutot's favor. After exhausting his administrative remedies, Thiboutot sought judicial review of the benefits denial under 42 U.S.C. § 1983. Upon eventual review, the United States Supreme Court held:

> Even where the language is ambiguous, however, any doubt as to its [§ 1983's] meaning has been resolved by our several cases suggesting, explicitly or implicitly, that the § 1983 remedy broadly encompasses violations of federal statutory as well as constitutional law.

448 U.S. at 4, 100 S.Ct. at 2504 (citations omitted).

This broad language has been refined in subsequent decisions. In *Middlesex County Sewerage Authority v. National Sea Clammers Association,* 453 U.S. 1, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981), the Supreme Court narrowed the application of § 1983 to statutory claims by excluding those cases in which (i) Congress had, in the statute at issue, foreclosed private enforcement of the statute in the enactment itself, and (ii) it was clear that the statute at issue was not the kind that created enforceable "rights." *Sea Clammers,* 453 U.S. at 19, 101 S.Ct. at 2625 (1981), *citing Pennhurst State School and Hospital v. Halderman,* 451 U.S. 1, 28, 101 S.Ct. 1531, 1545, 67 L.Ed.2d 694 (1981).

The key inquiry is the intent of the Legislature (citations omitted). We look first, of course, to the statutory language, particularly the provisions made therein for enforcement and relief. Then we review the legislative history and other traditional aids of statutory interpretation to determine congressional intent. *Sea Clammers,* 453 U.S. at 13, 101 S.Ct. at 2622. "Under these cases [*Thiboutot, Pennhurst,* and *Sea Clammers*], if there is a state deprivation of a 'right' secured by a federal statute, § 1983 provides a remedial cause of action *unless* the state actor *demonstrates by express provision* or other specific evidence from the statute itself that Congress intended to foreclose such private enforcement. 'We do not lightly conclude that Congress intended to preclude reliance on § 1983 as a remedy' for the deprivation of a federally secured right." *Wright v. Roanoke Redevelopment & Housing Authority,* 479 U.S. 418, 423–424, 107 S.Ct. 766, 770–771, 93 L.Ed.2d 781 (1987), *quoting Smith v. Robinson,* 468 U.S. 992, 1012, 104 S.Ct. 3457, 3468, 82 L.Ed.2d 746 (1984).

The Court, then, looks first to the plain language of the statute to see if Congress intended to supplant a § 1983 remedy with a comprehensive regulatory scheme for cable television. In favor of defendants' position is the fact that, at several points in the Cable Communications Policy Act of 1984, Congress specifically ordained exclusively federal, or concurrent federal-state, judicial review of state actions in regulating cable television. Section 635 of the Act provides the following:

**Judicial proceedings**

(a) Any cable operator adversely affected by any final determination made by a franchising authority under section 545 or 546 of this title [§ 625 or § 626 of the Act] may commence an action within 120 days after receiving notice of such determination, which may be brought in—

(1) the district court of the United States for any judicial district in which the cable system is located; or

(2) in any State court of general jurisdiction having jurisdiction over the parties.

(b) The court may award any appropriate relief consistent with the provisions of the relevant section described in subsection (a) of this section.

47 U.S.C. § 555.

Section 625 of the Act, 47 U.S.C. § 545, governs a local franchising authority's power to modify, or to refrain from modifying, a franchisee's obligations during the course of a franchise agreement. Section 626 of the Act, 47 U.S.C. § 546, governs franchise renewal procedures.[4] Section 612 of the Act, a section directly involved in this litigation,[5] grants exclusive federal judicial review of actions by cable operators in dealings with cable programmers:

**(d) Right of action in district court; relief; factors not to be considered by court**

Any person aggrieved by the failure or refusal of a cable operator to make channel capacity available for use pursuant to this section may bring an action in the district court of the United States for the judicial district in which the cable system is located to compel that such capacity be made available. If the court finds that the channel capacity sought by such person has not been made available in accordance with this section, or finds that the price, terms, or conditions established by the cable operator are unreasonable, the court may order such system to make available to such person the channel capacity sought, and further determine the appropriate price, terms, or conditions for such use consistent with subsection (c) of this section and may award actual damages if it deems such relief appropriate. In any such action, the court shall not consider any price, term, or condition established between an operator and an affiliate for comparable services.

47 U.S.C. § 532(d).

Defendants' position is that because the Legislature gave express jurisdictional grants in some sections of the Cable Communications Policy Act of 1984, the absence of jurisdictional grants elsewhere in the

---

**4.** Both §§ 625 and 626 of the Act designate the grounds for judicial review:

**(b) Judicial proceedings; grounds for modification by court**

(1) Any cable operator whose request for modification under subsection (a) of this section has been denied by a final decision of a franchising authority may obtain modification of such franchise requirements pursuant to the provisions of section 555 of this title.

(2) In the case of any proposed modification of a requirement for facilities or equipment, the court shall grant such modification only if the cable operator demonstrates to the court that—

(A) it is commercially impracticable for the operator to comply with such requirement; and

(B) the terms of the modification requested are appropriate because of commercial impracticability.

(3) In the case of any proposed modification of a requirement for services, the court shall grant such modification only if the cable operator demonstrates to the court that the mix, quality, and level of services required by the franchise at the time it was granted will be maintained after such modification.

47 U.S.C. § 545(b).

**(e) Judicial review; grounds for relief**

(1) Any cable operator whose proposal for renewal has been denied by a final decision of a franchising authority made pursuant to this section, or has been adversely affected by a failure of the franchising authority to act in accordance with the procedural requirements of this section, may appeal such final decision or failure pursuant to the provisions of section 555 of this title.

(2) The court shall grant appropriate relief if the court finds that—

(A) any action of the franchising authority is not in compliance with the procedural requirements of this section; or

(B) in the event of a final decision of the franchising authority denying the renewal proposal, the operator has demonstrated that the adverse finding of the franchising authority with respect to each of the factors described in subparagraphs (A) through (D) of subsection (c)(1) of this section on which the denial is based is not supported by a preponderance of the evidence, based on the record of the proceeding conducted under subsection (c) of this section.

**(f) Finality of administrative decision**

Any decision of a franchising authority on a proposal for renewal shall not be considered final unless all administrative review by the State has occurred or the opportunity therefor has lapsed.

47 U.S.C. § 546(e), (f).

Not only is jurisdiction allowed, then, but the factors to be weighed in the Court's decision and the standards of proof to be met are all statutorily mandated. This is a fairly comprehensive set of instructions to a court.

**5.** See pp. 416–418, *infra.*

Act betrays the intent of Congress not to grant jurisdiction to the courts over any other matter governed by the Act. *Inclusio unius est exclusio alterius.*

The legislative history of the Cable Communications Policy Act of 1984 is set out in House Report No. 934, 98th Cong.2d Sess. (1984), *reprinted in* 1984 U.S.CODE CONG. & ADMIN.NEWS 4655. Although, pursuant to the agreement of the Conference Committee, the Senate bill (S. 66) was passed, the House bill (H.R. 4103) contained significant portions that amended the approved Senate bill, and the House Report on the bill was adopted. The legislative history specifically analyzes each provision of the Act. In detailing what became—after amendment in the Conference Committee—sections 638 and 639 of Act, the House report reads:

### Section 639. [§ 638 of the Act as passed by Congress] Criminal and civil liability

Section 639 [638] provides that nothing in the title shall be deemed to affect the criminal or civil liability of cable programmers or cable operators with respect to Federal (including FCC regulations), state and local laws not inconsistent with this title relating to libel, slander, obscenity, incitement, privacy, false or misleading advertising, or other similar areas of law. The section further provides that cable operators cannot be held criminally or civilly liable for material transmitted over public, educational, or governmental access channels, or leased access channels, since the bill otherwise prohibits the operator's editorial control over all such channels. Cable programmers shall include all parties that exercise control over the content of programs, and would not only include program producers to the extent this would be consistent with applicable Federal, state and local law.

The Committee does not intend to affect liability which might result from other speech which may be held by the courts to be unentitled to constitutional protection (as discussed in relation to section 624(d)).

### Section 640. [§ 639] Obscene programming

This section establishes the Federal standard and penalties to be applicable to cable television with respect to pornographic programming. The bill sets forth a criminal prohibition against the transmission of any cable service which is obscene or otherwise unprotected by the Constitution. Any violation is punishable by a fine of up to $10,000 or by imprisonment for up to two years, or both.

Existing severability provisions of the Communications Act of 1934 (47 U.S.C. 608) shall apply if this section, among other sections, of H.R. 4103 is held invalid.

H.R.Rep. No. 934 at 95, 1984 U.S.CODE CONG. & ADMIN.NEWS at 4732. These sections clearly delineate the difference between a cable programmer (one who produces video programming) and a cable operator. The section also does not—in so many words—give an explicit jurisdictional grant to this court to entertain an action for declaratory judgment that cable operators may not be prosecuted under Federal, state, or local laws for any of the enumerated examples of constitutionally unprotected speech. This, however, is as far as defendants' argument can be stretched.

There is certainly no question that these sections do not explicitly *deny* this Court jurisdiction to entertain the declaratory judgment action. *Wright,* 479 U.S. at 423, 107 S.Ct. at 770. Neither can the Court read into section 638 of the Act an *implicit* denial of jurisdiction. The Court must examine, however, whether there is an implicit *grant* of jurisdiction, *i.e.,* an implicit cause of action.

Whether a cause of action may be so implied must be examined through the four-part analysis of *Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975). The Supreme Court in that case reviewed an injunction obtained against directors of a corporation who had expended corporate funds on the 1972 presidential elections, in apparent violation of 18 U.S.C. § 610. Although intervening 1974 amendments to

the Federal Election Campaign Act relegated citizen complaints concerning election law violations to the expertise of the newly created Federal Election Commission, prior to the 1974 amendments, when the lawsuit was instigated, no private cause of action could be implied under 18 U.S.C. § 610. *Cort,* 422 U.S. at 80–85, 95 S.Ct. at 2089–2091.

> In determining whether a private right of action is implicit in a statute not expressly providing one, several factors are relevant. First, is the plaintiff 'one of the class for whose *especial* benefit the statute was enacted,' [citation omitted]—that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or deny one? [citation omitted]. Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? [citations omitted]. And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law. [citations omitted].

*Cort,* 422 U.S. at 78, 95 S.Ct. at 2088.

The Court examines these factors seriatim. First, the Court finds that cable operators are clearly a class of persons for whose especial benefit the Cable Communications Policy Act, and section 638 in particular, was enacted. The act as a whole sets forth a comprehensive regulatory scheme protecting cable operators, under various conditions, from unchecked power exercised by local franchise authorities and, here, in section 638, from civil and criminal liability, under certain circumstances. These are benefits, and the cable operator beneficiaries are clearly identified in the plain language of the statute.

Second, while there is no explicit or implicit indication of intent to deny a remedy, and although there is no explicit indication of intent to grant a remedy, the Court finds that there is implicit indication of intent to create a remedy in favor of cable operators for violation of § 638. Defendants' argument that a remedy is foreclosed is unavailing. This is not a case "[w]hen the remedial devices provided in a particular Act are sufficiently comprehensive, [that] they may suffice to demonstrate congressional intent to preclude the remedy of suits under § 1983." *Sea Clammers,* 453 U.S. at 20, 101 S.Ct. at 2626. It is true that Congress did give explicit remedies for many things in the Act. Nevertheless, there is no enforcement mechanism otherwise provided in the Cable Communications Policy Act of 1984 should local authorities seek to prosecute a cable operator, for example, under an anti-obscenity statute. Furthermore, the language absolving cable operators is in mandatory, not precatory, terms: "[C]able operators *shall not incur any liability.*" 47 U.S.C. § 558 (emphasis supplied). Such a mandate is in contra-distinction to such cases as *Pennhurst,* where the federal statute at issue merely advised the states to pursue a particular course of conduct. *Pennhurst,* 451 U.S. at 27, 101 S.Ct. at 1545; *see also Samuels v. District of Columbia,* 770 F.2d 184, 195 (D.C.Cir. 1985). This Court concludes that section 638 of the Act, 47 U.S.C. § 558, means what it says, that cable operators shall not incur any criminal or civil liability for programming cablecast under the provisions of section 612 of the Act, 47 U.S.C. § 532.

Third, an implied right of action to seek a declaratory judgment that a cable operator's cablecasting programming pursuant to section 612 of the Act are immune from state prosecution, is wholly consistent with the underlying purposes of the legislative scheme. The purposes underlying the Cable Communications Policy Act of 1984 are set forth in the statute.

**Purposes**

The purposes of this subchapter are to—
(1) establish a national policy concerning cable communications;
(2) establish franchise procedures and standards which encourage the growth and development of cable systems and which assure that cable systems are responsive to the needs and interests of the local community;

(3) establish guidelines for the exercise of Federal, State, and local authority with respect to the regulation of cable systems;

(4) assure that cable communications provide and are encouraged to provide the widest possible diversity of information sources and services to the public;

(5) establish an orderly process for franchise renewal which protects cable operators against unfair denials of renewal where the operator's past performance and proposal for future performance meet the standards established by this subchapter; and

(6) promote competition in cable communications and minimize unnecessary regulation that would impose an undue economic burden on cable systems.

47 U.S.C. § 521.

For purposes of this case, the Court focuses on the first three enumerated purposes of the Act. Puerto Rico undeniably has an interest in controlling the dissemination of obscene material. The Court need not, however, at this time make any determination concerning the type of programming carried on The Playboy Channel. The Court here examines the narrow question of what rights, if any, are enforceable, and by whom, under § 638 of the Cable Communications Policy Act of 1984. Congress established in that Act a national policy, one that coordinates federal, state, and local authority over cable franchising. In the legislative history, Congress stated—

H.R. 4103 [the House of Representatives predecessor of the Act] establishes a national policy that clarifies the current system of local, state and Federal regulation of cable television. This policy continues reliance on the local franchising process as the primary means of cable television regulation, while defining and limiting the authority that a franchising authority may exercise through the franchise process.

H.R.Rep. No. 934 at 19, 1984 U.S.CODE CONG. & ADMIN.NEWS at 4656.

Congress, then, has taken control of cable television and ceded back to the local authorities certain limited powers. Congress' aim was to achieve a nationwide uniformity of regulation:

[T]he Committee recognizes that the franchise process in every city has very significant national implications for the full development of cable telecommunications and for the delivery of the widest diversity of information sources. In view of this national impact, it is appropriate and necessary for Congress to adopt cable legislation.

Id. at 22, 1984 U.S.CODE CONG. & ADMIN.NEWS at 4659.

The legislation also contains provisions to assure that cable systems provide the widest possible diversity of information services and sources to the public, consistent with the First Amendment's goal of a robust marketplace of ideas—an environment of "many tongues speaking with many voices."

Id. at 19, 1984 U.S.CODE CONG. & ADMIN.NEWS at 4656.

In keeping with this promotion of first amendment values, Congress established two kinds of access to cable systems by cable programmers. The first, detailed in section 611 of the Act, mandates an allotment of channel capacity to public, educational, and governmental (PEG) cable programmers. 47 U.S.C. § 531. These "PEG access channels" operate independently of editorial control by the cable operator. CCPA § 611(e), 47 U.S.C. § 531(e). The second access system, known as leased access, is contained in section 612 of the Act and

is aimed at assuring that cable channels are available to enable program suppliers to furnish programming when the cable operator may elect not to provide that service as part of the program offerings he makes available to subscribers. Thus, section 612 establishes a scheme to assure access to cable systems by third parties unaffiliated with the cable operator, and thereby promotes and encourages an increase in the sources of programming available to the public.

Id. at 47, 1984 U.S.CODE CONG. & ADMIN.NEWS at 4684.

Like PEG access channels, section 612(c)(2) provides that commercial leased access channels are free from the editorial control of the cable operators supplying the access. 47 U.S.C. § 532(c)(2). In keeping with this deprivation of editorial control, the legislative history points out that:

> [Section 638 of the Act, 47 U.S.C. § 558] further provides that cable operators cannot be held criminally or civilly liable for material transmitted over public, educational, or governmental access channels, or leased access channels, since the bill otherwise prohibits the operator's editorial control over all such channels.

H.R.Rep. No. 934 at 95, 1984 U.S.CODE CONG. & ADMIN.NEWS at 4732. Cable operators cablecasting pursuant over PEG or leased access channels are not liable for material thereby broadcast. The statute says so, and the legislative history reiterates it. In the face of threatened local prosecution, a declaratory judgment preempting the prosecution is wholly consistent with purposes underlying the Act.

Fourth, the implied right of action sought by plaintiffs in this case is not one traditionally relegated to state law. Congress has raised regulation of cable television to the national level to ensure the national development of cable telecommunications. A ban on local prosecution for material cablecast on a federally established and protected channel is a matter for the federal courts. It is a question of preemption, and the federal courts are best equipped to enforce that constitutional doctrine. The Court therefore holds that there is jurisdiction to examine whether relief may be granted for alleged violations of the Cable Communications Policy Act of 1984 under 42 U.S.C. § 1983.

## II. STANDING

Defendants have argued, for various reasons, that none of the plaintiffs has standing to bring this suit.

### A. *Plaintiff Puerto Rico Cable Television Association*

■ Defendants have argued that the Puerto Rico Cable Television Association (PRCTA), being an unincorporated association, lacks capacity to sue. In support of that argument, defendants cite the Civil Code of Puerto Rico for the proposition that an artificial person, such as PRCTA, has capacity to sue and be sued only if recognized and organized by law. Defendant contends that insofar as PRTCA has never formally incorporated or organized under the laws of Puerto Rico, it is not a juridically cognizable person. This argument ignores the plain language of Fed.R. Civ.P. 17(b):

> **Capacity to Sue or be Sued** ... In all other cases capacity to sue or be sued shall be determined by the law of the state in which the district court is held, *except* (1) that a partnership or other unincorporated association, which has no such capacity by the law of such state, may sue or be sued in its common name *for the purpose of enforcing for or against it a substantive right existing under the Constitution or laws of the United States.* (emphasis added).

Defendant next contends that plaintiff PRCTA has no standing to sue on its own behalf. Defendant argues that the allegations of the complaint—that PRCTA will suffer itself financial and non-financial injuries—are insufficient to warrant the granting of the declaratory and injunctive relief requested.

In *Camel Hair and Cashmere Institute v. Associated Dry Goods*, 799 F.2d 6 (1st Cir.1986), the United States Court of Appeals for the First Circuit examined the sufficiency of pleadings in a case where a trade association brought suit on its own behalf as well as on behalf of its members. The Institute claimed damages from the defendant's actions in two ways: first, that defendant's action would injure the Institute's reputation and credibility as a public-interest organization; and second "by causing such severe harm to its members as to impair the members' ability to pay their dues to the plaintiff [Institute]." *Id.* at 10. The First Circuit held these allegations insufficient to warrant preliminary injunctive relief under the Lanham Act. *Id.*

In this case, plaintiff PRCTA has not made allegations that rise even to the level of specificity that the First Circuit found insufficient in *Camel Hair*. The Court is therefore constrained to find that PRCTA has no standing to sue on its own behalf.

Nevertheless, PRCTA does have standing to sue on behalf of its members. An association may have standing to sue on behalf of its members even absent injury to the association itself, under certain circumstances. *Warth v. Seldin*, 422 U.S. 490, 511, 95 S.Ct. 2197, 2211, 45 L.Ed.2d 343 (1975); *Camel Hair*, 799 F.2d at 10.

> [A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

*Hunt v. Washington Apple Advertising Commission*, 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977); *see also New York State Club Association v. City of New York*, — U.S. —, 108 S.Ct. 2225, 2231–32, 101 L.Ed.2d 1 (1988).

The Court finds that each of the individual members of PRCTA could have sufficiently alleged a real and immediate claim under 42 U.S.C. § 1983 for enforcement of the preemption provisions of the Cable Communications Policy Act of 1984. The Court has made a detailed analysis that such a case or controversy exists. The record before the Court, including the stipulations of the parties, reveals that any member of PRCTA could have brought this action and would have alleged a particularized harm sufficient to give that member standing.

As to the second factor enunciated by the *Washington Apple* Court, this Court finds that plaintiffs have sufficiently pled the organizational purposes of the PRCTA, and that these avowed purposes are consonant with the relief requested and the interest sought to be protected in this suit. This Court further finds that suit by the PRCTA on behalf of its members satisfies the third *Washington Apple* requirement. The claim asserted and the relief requested, at this stage of the litigation, do not require the participation of the individual PRCTA members. "Actions for declaratory, injunctive and other forms of prospective relief have generally been held particularly suited to group representation." *Camel Hair*, 799 F.2d at 12 (citations omitted). The relief requested here runs to all PRCTA members equally: protection from local prosecution. No individualized evidence is required.

### B. The Playboy Plaintiffs

■ The defendants have challenged the standing of plaintiffs Playboy Enterprises, Inc., (PEI) and the Playboy Programming Distribution Corp. (PPDC) (collectively the Playboy plaintiffs) to bring suit seeking a declaratory judgment and injunction against defendants for prosecution. Defendants argue that the Playboy plaintiffs have no standing to enforce the statutory or constitutional rights of a third party in this case, the individual members of the PRCTA. The Court holds otherwise. "When a governmental prohibition or restriction imposed on one party causes specific harm to a third party, harm that a constitutional provision or statute was intended to prevent, the indirectness of the injury does not necessarily deprive the person harmed of standing to vindicate his rights." *Warth v. Seldin*, 422 U.S. at 505, 95 S.Ct. at 2208 (citation omitted). To pass the standing threshold, the Playboy plaintiffs here must demonstrate three facets of their claim. First, the Playboy plaintiffs must show " 'actual or threatened injury as a result of the putatively illegal conduct of the defendant,' " *Valley Forge Christian College v. Americans United for Separation of Church and State*, 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982), *quoting Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91, 99, 99 S.Ct. 1601, 1607, 60 L.Ed.2d 66 (1979). Second, the injury must be such that it " 'fairly can be traced to the challenged action.' " *Valley Forge*, 454 U.S. at 472, 102 S.Ct. at 758, *quoting Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 38,

96 S.Ct. 1917, 1924, 48 L.Ed.2d 450 (1976). Finally, the challenged action must be of the kind "'likely to be addressed by a favorable decision.'" *Valley Forge*, 454 U.S. at 472, 102 S.Ct. at 758, *quoting Simon*, 426 U.S. at 41, 96 S.Ct. at 1925.

The injury alleged by the Playboy plaintiffs is the deprivation of their ability to disseminate The Playboy Channel on cable systems composing the membership of the PRCTA and the threat of deprivation of this dissemination ability with regards to PRCTA member Teleponce, Inc. It is alleged that this deprivation would come about via local anti-obscenity prosecution of PRCTA members in violation of rights guaranteed by § 638 of the Act, 47 U.S.C. § 558. The first question posed by this assertion is whether a lack of cablecast of The Playboy Channel is an injury at all.

In *Bantam Books v. Sullivan*, 372 U.S. 58, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963), the United States Supreme Court declared unconstitutional the informal administrative actions of the Rhode Island Commission To Encourage Morality in Youth. The Commission sent notices to book distributors detailing that a majority of the Commission members had found certain listed books distributed by the bookseller to be "objectionable." 372 U.S. at 62, 83 S.Ct. at 635. The notices usually went on to describe the Commission's duty to refer cases it considered to be purveyance of obscenity to the Rhode Island Attorney General for prosecution. The Supreme Court considered these "prior administrative restraints," operating without the benefit of the protections afforded by judicial proceedings, to be censorship. 372 U.S. at 71–72, 83 S.Ct. at 639–640. In reaching this result, the Court examined the standing of the appellant publishers to seek relief from the notices sent to the distributors. The Supreme Court noted:

> The constitutional guarantee of freedom of the press embraces the circulation of books as well as their publication, *Lovell v. Griffin*, 303 U.S. 444, 452 [58 S.Ct. 666, 669, 82 L.Ed. 949] (1938), and the direct and obviously intended result of the Commission's activities was to curtail the circulation in Rhode Island of books

> published by appellants ... Unless he [the publisher] is permitted to sue, infringements of freedom of the press may too often go unremedied. (citation omitted).

*Bantam Books*, 372 U.S. at 62 n. 4, 83 S.Ct. at 635 n. 4.

This Court views the relationship between the Playboy plaintiffs and the PRCTA to be the cable television equivalent of the publisher and bookseller. When the cable operator is prohibited from cablecasting, so too is the cable programmer prohibited from disseminating programming. This analysis certainly allows the Playboy plaintiffs standing to sue for declaratory and injunctive relief for alleged violations of the first amendment. Whether the Playboy plaintiffs have standing to sue for enforcement of the PRCTA's preemptive rights under section 638 of the Act, 47 U.S.C. § 558, is another question.

Ultimately, that separate question is so intimately entwined with the first amendment question as to give the Playboy plaintiffs standing. We return to House Report 934:

> The legislation also contains provisions to assure that cable systems provide the widest possible diversity of information services and sources to the public, consistent with the First Amendments goal of a robust marketplace of ideas—an environment of "many tongues speaking with many voices."

H.R.Rep. No. 934, 98th Cong.2d Sess. (1984) at 19, *reprinted in* 1984 U.S. CODE CONG. & ADMIN. NEWS at 4656. *See also* § 601, Cable Communications Policy Act of 1984, 47 U.S.C. § 521 (Purposes). In addressing standing questions, the Supreme Court "has required that the plaintiff's complaint fall within 'the zone of interests to be protected or regulated by the statute or constitutional guarantee in question.'" *Valley Forge*, 454 U.S. at 475, 102 S.Ct. at 760, *quoting Association of Data Processing Service Organizations v. Camp*, 397 U.S. 150, 153, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1970) (footnote omitted). The Playboy plaintiffs' complaint fully

meets this requirement. The Cable Communications Policy Act of 1984 provides a statutory mechanism for vindication of first amendment interests for cable operators, cable programmers, and the public by forcing the operators and programmers to work together for the benefit of the public. *Cf. Red Lion Broadcasting v. Federal Communications Commission,* 395 U.S. 367, 392, 89 S.Ct. 1794, 1807, 23 L.Ed.2d 371 (1969) (fairness doctrine upheld despite limited infringement of free speech rights of broadcasters caused by requiring them to broadcast opposing viewpoints). The rights and responsibilities of the cable operators and cable programmers in meeting the first amendment interests of the public are mutually reinforcing. Cable operators, the PRCTA here, plainly have standing to seek a declaration of protection under § 638 of the Act, 47 U.S.C. § 558. Cable programmers, the Playboy plaintiffs here, have standing to seek a declaration of protection under that same provision because of the personal injury that would necessarily befall them absent their ability to bring suit. *Bantam Books,* 372 U.S. at 64 n. 6, 83 S.Ct. at 636 n. 6.

The second factor of the *Valley Forge* analysis requires this Court to examine whether the alleged injury " 'fairly can be traced to the challenged action.' " 454 U.S. at 472, 102 S.Ct. at 758 (citation omitted). The Court's analysis of whether a "case or controversy" exists here, *supra* pp. 403–408, answers this question. It is precisely the threats of prosecution, the challenged action, that pose the injury alleged by plaintiffs. As to the third *Valley Forge* factor, whether the injury " 'is likely to be redressed by a favorable decision' ", *id.,* this question is likewise affirmatively answered. The Playboy plaintiffs therefore have standing to seek declaratory and injunctive relief under 42 U.S.C. § 1983 for violation of rights guaranteed under the Cable Communications Policy Act of 1984.

The Court has therefore reached the jurisdictional and standing issues as to all plaintiffs' claims for declaratory and injunctive relief under 42 U.S.C. § 1983 for alleged violations of the Cable Communications Policy Act of 1984. A justiciable case or controversy exists, which may be brought before the Court under the civil rights statute, and, with the exception of PRCTA suing on its own behalf, all plaintiffs here have standing to bring the suit.

### III. PREEMPTION OF LOCAL PROSECUTION OF CABLE OPERATORS

■ The statutory framework whereby unaffiliated cable programmers may seek mandatory leased access is already set forth in this Opinion and Order. *See supra,* pp. 406–407. Plaintiffs aver that The Playboy Channel is being shown on the cable system of a PRCTA member pursuant to 612 of the Act, 47 U.S.C. § 532. It is undisputed that the PRCTA member at issue, Teleponce, is a cable system with a 36–channel capacity and all 36 channels are activated.[6] Under § 612(b)(1)(A), a cable operator with a channel capacity of at least 36 but not more than 54 activated channels must devote ten percent of that capacity to leased access. For Teleponce, then, at least three channels must be made available for leased access.

Plaintiffs have submitted affidavits that in April 1987, shortly before this lawsuit was filed, a verbal request was made by the Playboy plaintiffs to Teleponce. The request was for a designation of The Playboy Channel as a § 612 leased access channel. That request was not confirmed in writing until July 22, 1987, by letter from plaintiff PPDC to the president of Teleponce.

Defendants have characterized the § 612 designation of The Playboy Channel as a

---

**6.** The term "activated channels"—
means only the number of channels that subscribers actually are receiving. Although this would include any so-called dark channels which subscribers receive but which currently carry no programming, it would not equate to the total channel capacity of the system.

130 CONG. REC. H 10441 (daily ed. Oct. 1, 1984) (statement of Rep. Wirth, floor manager of H.R. 4103), *reprinted in* 1984 U.S. CODE CONG. & ADMIN. NEWS at 4751.

"post hoc attempt by PRCTA and PPDC to fashion the facts." The Court considers this line of argumentation unnecessary. Plaintiffs have shown that by at least July 22, 1987: (1) Teleponce was a cable system with 36 activated channels, making it fall under § 612(b)(1)(A) of the Act, 47 U.S.C. § 532(b)(1)(A); (2) The Playboy plaintiffs are "unaffiliated" with the cable operator Teleponce within the meaning of § 612(c)(1), 47 U.S.C. § 532(c)(1). Section 602(1) of the Act, 47 U.S.C. § 522(1); (3) The Playboy plaintiffs were seeking access for "commercial use" within the meaning of § 612(b)(5)(B) of the Act, 47 U.S.C. § 532(b)(5)(B); and (4) it may be fairly said without contradiction that Teleponce did in fact provide access for The Playboy Channel. § 612(c)(1) of the Act, 47 U.S.C. § 532(c)(1). The letter of July 22, 1987, makes clear that Teleponce lost editorial control over The Playboy Channel, as provided by § 612(c)(2) of the Act, 47 U.S.C. § 532(c)(2).

Section 638 of the Cable Communications Policy Act of 1984 then provides that

cable operators shall not incur any [civil or criminal] liability for any program carried on any ... channel obtained under section 532 of this title [§ 612 of the Act] or under similar arrangements.

The Court must conclude that this plain language means what it says: the Commonwealth of Puerto Rico's authority to bring criminal obscenity prosecutions against Teleponce or other similarly situated PRCTA members is preempted.

Defendants have attempted to shift the Court's attention to minor matters which the Court here disposes of. First, defendants claim that the designation of The Playboy Channel after the onset of this litigation reveals that previous transmission of The Playboy Channel was voluntary. Defendants argue, then, that such voluntary transmission is contrary to the spirit of diversity that the Act was designed to instill. A colloquy between Representative Timothy E. Wirth, Chairman of the Subcommittee on Telecommunications, Consumer Protection, and Finance of The House Committee on Energy and Commerce, and Representative Thomas J. Bliley, Jr., reveals otherwise

Mr. Bliley. I understand that cable operators have an obligation not to fill their commercial access channels in order to avoid bona fide access use. Would it be accruate to say, however, that cable operators may only enter into leased access arrangements where the operator is opposed to granting the programmer access to the cable system?

Mr. Wirth. No. There does not need to be a "hostile" or "adversarial" relationship between the operator and the programmer for a grant of access to an unaffiliated programmer to be a legitimate use of channel capacity designated pursuant to this section.

130 CONG. REC. H 10441 (Oct. 1, 1984), *reprinted in* 1984 U.S. CODE CONG. & ADMIN. NEWS 4752.

Defendant Rosa has argued that the contracts between PRCTA members and the Playboy plaintiffs' predecessors are not of a kind contemplated in § 612 of the Act and that therefore the Playboy plaintiffs cannot seek designation as a § 612 channel. The Court finds this argument without merit. The legislative history reveals that many sorts of commercial arrangements, including profit sharing, were deemed permissible under § 612. *See* 130 CONG. REC. H 10441 (Oct. 1, 1984) (Colloquy between Rep. Wirth and Rep. Bliley), *reprinted in* 1984 U.S. CODE CONG. & ADMIN. NEWS 4751–53; *see also* H.R. Rep. 934, 98th Cong.2d Sess. at 50–52, *reprinted in* 1984 U.S. CODE CONG. & ADMIN. NEWS at 4687–89.

Defendants finally argue that, in any event, The Playboy Channel on Teleponce was not designated as a § 612 channel until July 22, 1987, and that therefore local obscenity prosecution is not preempted for allegedly obscene transmissions prior to that date. The consent decree in this case already enjoins local obscenity prosecution of plaintiffs for any cable transmission prior to the date of the consent decree, June 4, 1987. The Court therefore need only examine the period between June 4 and July 22, a period of approximately six weeks.

All parties admit that the Cable Communications Policy Act of 1984 utterly changed cable television. The parties agree that contracts between the cable operators in this case, members of the PRCTA, and cable programmers, do not necessarily conform to the provisions of the Act. In viewing the purposes underlying the Cable Communications Policy Act of 1984 and the course of this litigation, the Court is not persuaded that the local prosecutors should consent to be permanently enjoined from prosecuting for pre–June 4 cable transmissions, be barred by Order of the Court from prosecuting post–July 22 cable transmissions, and be allowed, nevertheless, to go back to examine the period between June 4 and July 22. The Court also considers plaintiffs' affirmations that § 612 designation was requested of Teleponce by the Playboy plaintiffs in April, before the complaint was filed. Finally, the Court is convinced by the words of the statute:

> [C]able operators shall not incur any [criminal or civil] liability for any program carried on any ... channel obtained under section 532 of this title [§ 612 of the Act] *or under similar arrangements.*

47 U.S.C. § 558 (emphasis supplied).

Given the massive impact of this relatively newly minted legislation, the Court finds that the commercial arrangement between Teleponce and The Playboy Channel between June 4, 1987, and July 27, 1987, was of a sufficient tenor to acquire the preemptive protection of § 638 of the Act. 47 U.S.C. § 558.

The Court shall enter declaratory judgment in favor of the plaintiffs.

### IV. FACIAL CONSTITUTIONALITY OF LAW NO. 3 AND AGREEMENT NO. 2

■ Plaintiffs have further challenged the facial constitutionality of Law No. 3 and the Public Service Commission's administrative adoption of Law No. 3 as Agreement No. 2.

The Court is hard pressed to find Law No. 3 facially unconstitutional. The statute, extending the provisions of the extant Puerto Rico anti-obscenity statute, explicitly adopts the standards enunciated in *Miller v. California*, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973):

> ■ The basic guidelines for the trier of fact must be: (a) whether "the average person, applying contemporary community standards" would find that the work, taken as a whole, appeals to the prurient interest; (b) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law; and (c) whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value.

*Id.* at 24, 93 S.Ct. at 2615 (citations omitted).

The *Miller* test, slightly refined, was reaffirmed as recently as last term. *Pope v. Illinois*, 481 U.S. 497, 107 S.Ct. 1918, 95 L.Ed.2d 439 (1987). Law No. 3 does not present a prior restraint constituting censorship.

By the same token, Agreement No. 2 adopts the *Miller* test. Further, in contradistinction to *Bantam Books*, the Cable Communications Policy Act of 1984 is replete with judicial safeguards to prevent unbridled discretion on the part of the Public Service Commission resulting in impermissible censorship. Sections 625 and 626 of the Act, quoted *supra* note 5, permit judicial review of modifications and nonrenewals of franchises. 47 U.S.C. §§ 545, 546. Whether or not The Playboy Channel is obscene, and whether the PSC can force PRCTA members to adopt certain conditions before The Playboy Channel can be shown, or whether the PSC can deny or modify a franchise based upon that franchise's carriage of allegedly obscene programming, are all questions not before this Court. These must wait. The Court cannot find Law No. 3 and Agreement No. 2 facially unconstitutional.

### V. SUMMARY

Pursuant to 28 U.S.C. § 2201, the Court ADJUDGES AND DECREES the following:

1. Teleponce, Inc., carries The Playboy Channel, a program developed and distributed by plaintiffs Playboy Enterprises, Inc., and the Playboy Programming Distribution Corp., pursuant to § 612 of the Cable Communications Policy Act of 1984, 47 U.S.C. § 532.

2. Local prosecution of Teleponce, Inc., for violation of Law No. 3 of the Seventh Special Session of the Tenth Legislature of the Commonwealth of Puerto Rico is preempted by operation of § 638 of the Cable Communications Policy Act of 1984, 47 U.S.C. § 558.

3. Individual members of plaintiff Puerto Rico Cable Television Association, should they likewise designate channel capacity pursuant to § 612 of the Cable Communications Policy Act of 1984, 47 U.S.C. § 532, shall be free from criminal and civil liability under the laws of Puerto Rico for libel, slander, obscenity, incitement, invasions of privacy, or false or misleading advertising, pursuant to the preemptive provision of § 638 of the Cable Communications Policy Act of 1984, 47 U.S.C. § 558.

IT IS FURTHER ORDERED AND ADJUDGED that defendants, their agents and employees, their successors in office, and all persons in active concert with them, be and hereby are permanently enjoined, from in any manner, either directly or indirectly, initiating prosecutions against cable operator members of coplaintiff Puerto Rico Cable Television Association, or any of their agents, employees and representatives, based upon any video programming carried on The Playboy Channel.

SO ORDERED, DECREED, AND ADJUDGED.