**PLAYBOY ENTERPRISES, INC., et al., Plaintiffs, Appellees,**

v.

**PUBLIC SERVICE COMMISSION OF PUERTO RICO, et al., Defendants, Appellants.**

**No. 89–1026.**

United States Court of Appeals, First Circuit.

Heard Sept. 12, 1989.
Decided June 21, 1990.

26

Carlos Del Valle with whom Hector Rivera Cruz, Secretary of Justice, Rafael Ortiz Carrion, Sol. Gen., and Ramirez & Ramirez, Hato Rey, P.R., were on brief for defendants, appellants.

David W. Ogden with whom Donald B. Verrilli, Jr., Bruce J. Ennis, Jenner & Block, Washington, D.C., Maria Emilia Pico and Rexach & Pico, Santurce, P.R., were on brief, for plaintiffs, appellees.

Before BREYER, Circuit Judge, COFFIN and FAIRCHILD,* Senior Circuit Judges.

* Of the Seventh Circuit, sitting by designation.

FAIRCHILD, Senior Circuit Judge.

This is an appeal from a declaratory judgment and injunction entered by the district court. We borrow considerably from Judge Pieras' thorough opinion, published at 698 F.Supp. 401 (D. Puerto Rico 1988).

## I. Introduction

These facts are undisputed: Cable operating companies, after securing monopoly franchises from local authorities, provide the channels and hardware over which cable programming is transmitted. In order to encourage programming diversity, which might otherwise be stifled by the cable operator's monopoly, the Cable Communications Policy Act of 1984, Pub.L. No. 98–549, 98 Stat. 2780, 47 U.S.C. § 521, et seq. (the Cable Act), requires cable operators which provide thirty-six or more activated channels to designate a percentage of those channels for commercial use by persons unaffiliated with the operator. 47 U.S.C. § 532.[1] When a cable programmer requests access to channel capacity, and capacity so designated is available, the cable operator must provide it, subject to the cable operator's right to set a reasonable price, and reasonable terms and conditions of use of the channel (sometimes called a "leased access channel"). The operator may not exercise any editorial control over the programmer's choice of material. § 532(b)-(e). In exchange for the loss of editorial control, Congress relieved cable operators of potential criminal and civil liability for the content of transmissions carried over these channels, including liability for transmissions of obscenity. 47 U.S.C. § 558. See H.R.Rep. 934, 98th Cong., 2d Sess. 95 (House Report No. 84–934), 1984

U.S.Code Cong. & Admin.News 4655, 4732.[2]

Puerto Rican law criminalizes the transmission or retransmission of obscene programming over cable television. P.R. Laws Ann. tit. 33, §§ 4074(a) & (c); 4079a, as amended. The Commonwealth's cable television franchising authority, defendant Public Service Commission of Puerto Rico (the Commission), adopted in a document called "Agreement Number 2" the statutory definition of obscenity and the prohibition of obscene cable transmissions, and enumerated sanctions for violations by cable operating companies. The sanctions include fines and suspension or revocation of franchise licenses. 698 F.Supp. at 402–03.

In late March, 1987, defendant Angel E. Rosa, a prosecutor of Puerto Rico's Department of Justice, notified individual cable operating companies around the Commonwealth that he was preparing to file criminal obscenity charges against them for transmitting the Playboy Channel over their systems. By July, all cable operators except Teleponce, Inc., had stopped transmitting the Playboy Channel. 698 F.Supp. at 403; Supplemental Appendix (SA) at 91.

Playboy Enterprises, Inc. (PEI), through a wholly-owned subsidiary, distributes the Playboy Channel to cable operating companies. The Puerto Rico Cable Television Association (the Cable Association) is an unincorporated trade association representing a group of Puerto Rican cable operating companies. Both sued the defendants under 42 U.S.C. § 1983, alleging that the Commonwealth's obscenity statute, the Commission's Agreement Number 2, and the Justice Department's threatened prosecutions all violated the First Amendment. They also alleged that any prosecution of the cable operators for obscenity was precluded by the Cable Act.[3]

---

1. All references to provisions of the Cable Act are as codified in Title 47 of the United States Code.

2. Section 558 provides
   Nothing in [the Cable Act] shall be deemed to affect the criminal or civil liability of cable programmers or cable operators pursuant to the Federal, State, or local law of libel, slander, obscenity, incitement, invasions of privacy, false or misleading advertising, or under

similar laws, except that cable operators shall not incur any such liability for any program carried on any channel designated for public, educational, governmental use or on any other channel obtained under section 532 of this title or under similar arrangements.

3. PEI's wholly-owned subsidiary, the Playboy Programming Distribution Company of America, was added as a plaintiff by amendment. As no one has suggested any difference in their

The district court entered an agreed order on June 3, 1987. Under this order, the defendants were temporarily enjoined from prosecuting, during the pendency of this suit, any member of the Cable Association for any Playboy Channel transmissions. The defendants were also permanently enjoined from

(a) imposing any administrative sanctions against cable operator members of the Cable Association based upon any transmissions of the Playboy Channel, except that the Commission remained free to enact and enforce new regulations, consistent with the Constitution, concerning obscene cable transmission (leaving the Cable Association members a thirty-day window to challenge the regulations in court before they are enforced against them);

(b) threatening to prosecute members of the Cable Association for any programming carried on the Playboy Channel, or taking any adverse actions against the members in reprisal for the exercise of their First Amendment rights;

(c) prosecuting or sanctioning in any way members of the Cable Association or any other person or entity for past programming on the Playboy Channel;

(d) interfering with any programming carried on the Playboy Channel by intimidating or putting coercive pressure on members of the Cable Association.

The order left the Secretary of Justice free to prosecute *PEI* for obscenity based on its distribution of the Playboy Channel, and free to prosecute cable operators for *future* transmissions of the Playboy Channel. 698 F.Supp. at 404–05. The plaintiffs' damage claims against the other defendants were "held in abeyance during the pendency of the equitable claims," by agreement of the parties and the court. 698 F.Supp. at 403. The plaintiffs also dropped their challenge to the constitutionality of Puerto Rico's obscenity statute, and agreed to the dismissal of the Commis-

sion as a party, leaving only the individual defendants. Addendum C to Appellants' Brief. The parties then each moved for summary judgment on the sole question of whether the federal Cable Act precludes local prosecution of the Puerto Rican cable operators for obscenity.

In an opinion and order dated October 31, 1988, Judge Pieras declared that one member of the Cable Association, the operating company Teleponce, Inc., carries the Playboy Channel on a channel obtained by PEI pursuant to 47 U.S.C. § 532. The court declared that prosecution of Teleponce for transmitting the Playboy Channel is prevented by § 558. The court also declared that should other members of the Cable Association likewise designate channel capacity under § 532, they would similarly be free from criminal and civil liability. The court then enjoined the defendants from initiating any prosecution against any member of the Cable Association based upon any video programming carried on the Playboy Channel. 698 F.Supp. at 419 From this order, the defendants appeal.[4]

The defendants do not challenge the district court's bedrock legal holding: that 47 U.S.C. § 558 precludes local prosecution of a cable operator for obscenity, based on programming transmitted by that operator over a channel obtained under § 532 or under similar arrangements. The defendants raise a host of preliminary issues, of which we address four, relying on Judge Pieras' fine opinion as adequate answer to the rest. Three issues are related: whether federal question jurisdiction exists over this suit, whether a private cause of action is available, and whether the plaintiffs have standing to bring this action. The defendants also challenge the district court's consideration on summary judgment of certain evidence that Teleponce had agreed to transmit the Playboy Channel on a channel obtained under § 532 or similar arrangement.

respective rights or positions in this suit, we refer to PEI and PPDCA collectively as "PEI."

**4.** The district court also held that the Puerto Rican obscenity statute and the Commission's Agreement Number 2 are not facially unconsti-

tutional, although this claim had been dismissed by order dated August 31, 1987. Neither PEI nor the Cable Association challenges this holding, so we do not consider it on appeal.

## II. Subject Matter Jurisdiction [5]

■ The plaintiffs state that the district court had subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343. It seems clear that jurisdiction is not available under §§ 1343(a)(3) and (4), the only provisions of § 1343 which might apply. These provisions do not provide jurisdiction for a § 1983 action asserting the preemption of state law by federal statute, when the preempting federal law is not one providing for equal rights or the protection of civil rights. *Chapman v. Houston Welfare Rights Org.*, 441 U.S. 600, 612–20, 99 S.Ct. 1905, 1913–17, 60 L.Ed.2d 508 (1979). The Cable Act probably does not qualify as a civil rights law. However, because Congress has eliminated the minimum amount in controversy requirement from the general federal question jurisdiction provision (§ 1331), there is no need to pursue an independent inquiry of the scope of § 1343. *See* P. Bator, D. Meltzer, P. Mishkin, and D. Shapiro, Hart and Wechsler's *The Federal Courts and the Federal System* 1241 (3d ed. 1989) ("Hart and Wechsler's").

The defendants label the plaintiffs' suit an inappropriate attempt "to use the declaratory judgment mechanism as a defensive preemptive strike," citing, among other cases, *Public Serv. Comm'n v. Wycoff Co.*, 344 U.S. 237, 73 S.Ct. 236, 97 L.Ed. 291 (1952). Although the defendants do not call it such, we consider this a challenge to the existence of federal question jurisdiction. The relevant language from *Wycoff* reads

> Where the complaint in an action for declaratory judgment seeks in essence to assert a defense to an impending or threatened state court action, it is the character of the threatened action, and not the defense, which will determine whether there is federal-question jurisdiction in the District Court. If the cause of action, which the declaratory defendant threatens to assert, does not itself involve a claim under federal law, it is doubtful if a federal court may entertain an action for a declaratory judgment establishing a defense to that claim. This is dubious even though the declaratory complaint sets forth a claim of federal right, if that right is in reality in the nature of a defense to a threatened cause of action. Federal courts will not seize litigations from state courts merely because one, normally a defendant, goes to federal court to begin his federal-law defense before the state court begins the case under state law.

344 U.S. at 248, 73 S.Ct. at 242–43 (citations omitted). This court has followed this language in several cases. *See Greenfield and Montague Transp. Area v. Donovan*, 758 F.2d 22, 26–27 (1st Cir.1985); *Nashoba Communications v. Town of Danvers*, 893 F.2d 435, 437–38 (1st Cir. 1990); *Colonial Penn Group, Inc. v. Colonial Deposit Co.*, 834 F.2d 229, 223 (1st Cir.1987). The Supreme Court cited this passage with apparent approval in *Franchise Tax Board v. Laborers Vacation Trust Fund*, 463 U.S. 1, 16, 103 S.Ct. 2841, 2849, 77 L.Ed.2d 420 (1983).

The plaintiffs presently are seeking declaratory and injunctive relief based on their claim that 47 U.S.C. § 558 provides cable operators the right to be free from obscenity prosecutions based on material transmitted over leased access channels—in effect, that the Cable Act partially preempts local obscenity statutes.[6] Phrased this way, the suit does seem to run

---

5. *Our* jurisdiction to hear this appeal is not questioned, and seems proper. Along with declaratory and injunctive relief, the plaintiffs asked for damages. The presence of unresolved legal claims raises the question whether the district court's order of October 31, 1988 is final and appealable under 28 U.S.C. § 1291. However, regardless of the fate of the claim for damages, we have appellate jurisdiction under 28 U.S.C. § 1292(a)(1) to review the granting of injunctive relief.

6. The preemption works as follows: section 556(c) of the Cable Act says that (with one exception) any state or local law "inconsistent with this chapter shall be deemed to be preempted and superseded." Section 558 says that nothing in the Cable Act shall affect liability pursuant to federal, state, or local law of obscenity (and other subjects), except that cable operators shall not incur such liability for programming carried on a channel "obtained under § 532 of this title or under similar arrangements."

afoul of the general principle that in a suit for declaratory judgment, federal question jurisdiction cannot be based solely on the raising of a federal defense to a state law cause of action. *Franchise Tax Board*, 463 U.S. at 16, 103 S.Ct. at 2849.[7]

Without explaining exactly why, the Supreme Court has recognized a relevant limitation to the application of the rule stated in *Wycoff*. In an action by a group of airlines for declaratory and injunctive relief against New York State officials claiming that ERISA preempted the New York Human Rights Law and Disability Benefits Law, the Court acknowledged the existence of federal question jurisdiction:

> It is beyond dispute that federal courts have jurisdiction over suits to enjoin state officials from interfering with federal rights. *See Ex parte Young*, 209 U.S. 123, 160–162 [28 S.Ct. 441, 454–55, 52 L.Ed. 714] (1908). A plaintiff who seeks injunctive relief from state regulation, on the ground that such regulation is pre-empted by a federal statute which, by virtue of the Supremacy Clause of the Constitution, must prevail, thus presents a federal question which the federal courts have jurisdiction under 28 U.S.C. § 1331 to resolve.

*Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96 n. 14, 103 S.Ct. 2890, 2899 n. 14, 77 L.Ed.2d 490 (1983). The Court in *Shaw* distinguished *Franchise Tax Board*, which was decided the same day, by saying that case "was an action seeking a declaration that state laws were *not* pre-empted by ERISA. Here, in contrast, companies subject to ERISA regulation seek injunctions against enforcement of state laws they claim *are* pre-empted by ERISA, as well as declarations that those laws are pre-empted." *Shaw*, 463 U.S. at 96 n. 14, 103 S.Ct. at 2899 n. 14 (emphasis in original).

In two recent cases, this court has distinguished *Shaw* and applied the *Wycoff* rule. The plaintiff in the first, after having been sued in state court for state common law trade name infringement, brought a federal court action against its state court adversary, seeking a declaration and injunction, claiming that its rights under federal trademark law protected it from state law liability. *Colonial Penn Group*, 834 F.2d at 231–32. *Wycoff*, not *Shaw*, applied because the defendant in the federal declaratory suit was not enforcing a state regulatory scheme allegedly preempted by federal law, but was merely a private party claiming its rights under state law.

> Colonial Penn is not challenging a state regulatory system on the grounds that it is preempted by a parallel yet conflicting federal body of law. Penn is merely asserting that it has a federally protected mark that protects it against state common law infringement liability.... Jurisdiction over actions for declarations of pre-emption can logically only be asserted where a state official is the defendant.

834 F.2d at 237.

In *Nashoba Communications*, above, the defendant in the declaratory judgment action *was* a state actor—the Town of Danvers, which had granted Nashoba Communications a cable television franchise, and had demonstrated its intent to enforce a two-year "rate freeze" clause in its license agreement with the cable company. Nashoba Communications claimed that the Cable Communications Policy Act's provisions regarding rates preempted the license's "rate freeze" clause. However, since the Town was only claiming a right arising out of contract, rather than enforcing a regulatory scheme, the court held that *Shaw* did not apply. 893 F.2d at 440.

The *Wycoff* rule applies distinctions "involving perhaps more history than logic." *Franchise Tax Board*, 463 U.S. at 4, 103 S.Ct. at 2843. Although the meaningfulness of the distinction escapes us, we think this case is on its facts closer to *Shaw* than to *Colonial Penn Group* or *Nashoba Communications*.

---

**7.** Merely because an injunction as well as declaration of rights is sought does not distinguish this case from *Wycoff*. This court has held that when the injunctive relief sought in reality does no more than effectuate the declaratory judgment by preventing the application of state law, the *Wycoff* rule still applies. *Colonial Penn Group*, 834 F.2d at 236.

Unlike the defendants in *Colonial Penn Group*, defendants here *are* state actors. And unlike *Nashoba Communications*, these state actors are not trying to enforce a single, negotiated contract term, but are allegedly waging a comprehensive campaign to rid the Commonwealth of Puerto Rico of cable transmission of the Playboy Channel. The control the defendants seek to impose on the content of cable transmissions is effectuated through a criminal statute. If such regulation is carried out by prosecution or threats of prosecution against cable operators who are transmitting the Playboy Channel over leased access channels, it is preempted by federal law. Therefore, this case neatly fits the situation described in *Shaw:* a plaintiff seeking injunctive relief from a state enforcement action, on the ground that state law is preempted by a federal statute. *Shaw,* 463 U.S. at 96 n. 14, 103 S.Ct. at 2899 n. 14.

Additionally, although the plaintiffs have dropped their claims which rely explicitly on the First Amendment, we draw some comfort in our distinctions of *Colonial Penn Group* and *Nashoba Communications* from the willingness of federal courts, including the Supreme Court, to entertain declaratory and injunctive actions against prospective enforcement of state law which threatens to discourage expression. *See, e.g., Steffel v. Thompson,* 415 U.S. 452, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974); *Epperson v. Arkansas,* 393 U.S. 97, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968); *Dombrowski v. Pfister,* 380 U.S. 479, 490, 85 S.Ct. 1116, 1122, 14 L.Ed.2d 22 (1965); *Wulp v. Corcoran,* 454 F.2d 826, 831 (1st Cir.1972).

### III. The Availability of a Federal Cause of Action

The defendants, without adequately segregating them, raise two analytically distinct arguments. They question whether there is a federal cause of action, either under § 1983 or implied in the Cable Act, to support this lawsuit. They also question, assuming that a federal cause of action is available, whether PEI or the Cable Association (rather than the individual cable operators who were subjected to the threats of prosecution) are proper parties to bring this suit; that is, whether these plaintiffs have standing to sue. Putting aside for the moment the question of the plaintiffs' standing, we address the issue of the availability of a federal cause of action.

The district court found that the Cable Act implies a private cause of action under the four-part analysis of *Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975). 698 F.Supp. at 410–14. Because we hold that 42 U.S.C. § 1983 provides the plaintiffs with a right of action against the defendants, we need not consider whether a private cause of action is implied in the Cable Act. *See Samuels v. District of Columbia,* 770 F.2d 184, 194 (D.C.Cir. 1985); *Lynch v. Dukakis,* 719 F.2d 504, 510 (1st Cir.1983).

Section 1983 provides legal and equitable remedies against any person who, under color of state or territorial authority, deprives "any citizen of the United States or other person within the jurisdiction thereof" of "any rights, privileges, or immunities secured by the Constitution and laws." [8] The provision provides a remedy

---

**8.** Section 1983 reads in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress....

Relying in part on *Calero–Toledo v. Pearson Yacht Leasing Co.,* 416 U.S. 663, 94 S.Ct. 2080,

40 L.Ed.2d 452 (1973), which held that Puerto Rico's laws are "State statutes" for purposes of the Three Judge Act, 28 U.S.C. § 2281, this Circuit considers Puerto Rico a "State" within the meaning of § 1983. *Ortiz v. Hernandez Colon,* 511 F.2d 1080, 1081–83 (1st Cir.1975), *vacated and remanded on other grounds,* 429 U.S. 1031, 97 S.Ct. 721, 50 L.Ed.2d 742 (1977); *Berrios v. Inter Am. University,* 535 F.2d 1330, 1331 (1st Cir.1976). For this reason, and because at this point plaintiffs seek only injunctive relief, not damages which might threaten the Commonwealth's treasury, this case is not controlled by the Supreme Court's recent decision in *Ngirain-*

only for deprivations, by state actors, of rights, privileges or immunities created by federal law. It does not create a right of action for all violations of federal law. *Golden State Transit Corp. v. City of Los Angeles,* —— U.S. ——, 110 S.Ct. 444, 448, 107 L.Ed.2d 420 (1989). Federal rights, privileges and immunities which can be vindicated under § 1983 can be created by statute as well as the Constitution. *Maine v. Thiboutot,* 448 U.S. 1, 4, 100 S.Ct. 2502, 2504, 65 L.Ed.2d 555 (1980).

The Supreme Court has recognized two narrow exceptions to the general availability of § 1983 to remedy the deprivation, by state actors, of federal rights. First, there is no "right" enforceable under the statute if the substantive federal provision merely "express[es] a congressional preference for certain kinds of treatment," rather than imposes binding obligations on the states, or if the asserted federal interest is so "vague and amorphous" that it is "beyond the competence of the judiciary to enforce." *Golden State Transit Corp.,* 110 S.Ct. at 448 (quoting *Pennhurst State School v. Halderman,* 451 U.S. 1, 19, 101 S.Ct. 1531, 1541, 67 L.Ed.2d 694 (1981) and *Wright v. Roanoke Redev. & Housing Auth.,* 479 U.S. 418, 431–32, 107 S.Ct. 766, 775, 93 L.Ed.2d 781 (1987)). "Second, even if the plaintiff has asserted a federal right, the defendant may show that Congress 'specifically foreclosed a remedy under § 1983' by providing a 'comprehensive enforcement mechanis[m] for protection of a federal right.'" *Id.* (quoting *Smith v. Robinson,* 468 U.S. 992, 1004 n. 9, 1003, 104 S.Ct. 3457, 3464 n. 9, 3463, 82 L.Ed.2d 746 (1984).)[9]

We have no doubt the protection from liability provided cable operators by § 558 for the content of leased access channel programming is an "immunity" created by federal law and enforceable by the courts. Section 558 uses unequivocal, mandatory language: "cable operators shall not incur any liability for any program" carried on any public, educational, governmental or leased access channel. This immunity can be protected effectively by enjoining prosecution.

The defendants point out that the statutory immunity derives its preempting force through the Supremacy Clause, and that the Supremacy Clause *itself* does not provide a substantive federal right enforceable under § 1983. This is immaterial, so long as the preempting federal statute does provide such a right. "In all cases," the availability of § 1983 depends on whether the statute creates specific and enforceable obligations. *Golden State Transit Corp.,* 110 S.Ct. at 449.

We are also unconvinced by the defendants' argument that resort to § 1983 is precluded by the Cable Act itself. "[I]f there is a state deprivation of a 'right' secured by a federal statute, § 1983 provides a remedial cause of action unless the state actor demonstrates by express provision or other specific evidence from the statute itself that Congress intended to foreclose such private enforcement." *Wright,* 479 U.S. at 423, 107 S.Ct. at 770. The Cable Act does not expressly preclude actions brought under § 1983. However, it does contain certain private remedies and the defendants claim these constitute a

---

gas *v. Sanchez,* —— U.S. ——, 110 S.Ct. 1737, 109 L.Ed.2d 163 (1990), which held that because the Territory of Guam is not a "person" under § 1983, plaintiffs could not maintain a § 1983 damage action against Guam officials acting in their official capacities.

9. The Supreme Court has noted in dictum that it has also asked, when deciding whether a § 1983 action is available, whether the provision creating the federal right was "intended to benefit the putative plaintiff." *Golden State Transit Corp.,* 110 S.Ct. at 448 (citations omitted). The Court has yet to find § 1983 unavailable for this reason, and there is no indication that this dictum is any more than a recognition of the

general rule of *jus tertii* we address in Section IV below: that a party cannot, absent certain circumstances, raise the rights of another. Certainly the language of § 1983 itself does not restrict a plaintiff to asserting only its own rights—the statute provides legal and equitable relief to *"the person injured"* by the deprivation of the federal rights of *"any* person." Moreover, such a restriction would be contrary to a number of cases which recognize third party and associational standing in § 1983 suits. See *e.g., Hunt v. Washington Apple Advertising Comm'n,* 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977).

"multitiered, comprehensive and elaborate enforcement and remedial scheme." For example, the Cable Act provides for civil actions against cable operators who violate its protection of subscriber privacy, and against persons who violate its prohibition against unauthorized reception of cable service. 47 U.S.C. §§ 551(f), 553(c). Also, any person aggrieved by the failure of a cable operator to make channel capacity available for use pursuant to § 532 may either bring a civil action to compel such access, or petition the FCC for relief upon a showing of prior adjudicated violations. § 532(d) & (e). Cable operators can get judicial review of adverse decisions made by franchise authorities concerning the modification or renewal of franchise obligations. 47 U.S.C. § 555. The Cable Act grants franchising authorities the power to enforce consumer protection provisions included in franchise agreements, and has detailed procedures for enforcing the Act's equal employment requirements. 47 U.S.C. §§ 552(b), 532(g), 533(c) & 554.

The sum of these remedial provisions hardly creates a "comprehensive remedial scheme" leaving "no room for additional private remedies under § 1983" which is essential to finding an implied Congressional intent to preclude § 1983. *Wright,* 479 U.S. at 423, 107 S.Ct. at 770. Most importantly, none of these provisions affords a remedy against state actors (other than the franchise authority) who might encroach on rights guaranteed by the Cable Act, because the Cable Act's remedies are aimed either at private conduct regulated by the Act, or at the cable franchise authority. For certain, a statute's express remedies need not be as comprehensive or efficient as § 1983 in order to evince an intent to preclude use of § 1983. *Middlesex Cty. Sewerage Auth. v. Sea Clammers,* 453 U.S. 1, 14, 19–21, 101 S.Ct. 2615, 2623, 2625–27, 69 L.Ed.2d 435 (1981) (the availability of private injunctions under the federal water pollution acts precludes private § 1983 damage suit). *But see Lynch,* 719 F.2d at 510–11 (Secretary of HEW's power to withhold funds from states which do not comply with provisions of Social Security Act is insufficient to show congressional

intent to preclude § 1983 action). Yet, it seems clear that before one can conclude that Congress meant to displace a § 1983 suit with a particular remedial scheme, that scheme must at least serve to protect the federal right created in the statute and at issue in the case.

In *Sea Clammers,* the injunctions available to private parties, and the available agency enforcement powers, worked to protect the same federal right the plaintiffs seeking damages wanted to vindicate. 453 U.S. at 13–15, 101 S.Ct. at 2622–24. No similar provision in the Cable Act creates a procedure to guarantee that cable operators transmitting programs via leased access channels will not be prosecuted by local authorities. Thus, entertaining a § 1983 action does not "render superfluous most of the detailed procedural protection outlined in the statute." *Smith v. Robinson,* 468 U.S. at 1011–12, 104 S.Ct. at 3468. The defendants have not met their burden of demonstrating that Congress meant to preclude resort to § 1983 to protect the cable operator's immunity under § 558. *See Wright,* 479 U.S. at 423, 107 S.Ct. at 770.

## IV. Standing

The defendants argue that neither the Cable Association nor PEI has standing to bring this suit. Their separate challenges to the two plaintiffs' standing share the same core: whether a cable programmer or an association of cable operators can properly bring suit based on what the defendants consider to be an individual right of the cable operators.

### A. The Cable Association

█ The district court held that because the Cable Association alleged no injury to itself caused by the defendants, it did not have standing to sue on its own behalf. 698 F.Supp. at 413–14. This ruling is not challenged on appeal. The court did hold, however, that the Cable Association had standing to sue on behalf of its members. *Id.* at 414.

The parties and the district court agreed that the relevant test was stated in *Hunt v. Washington Apple Advertising Comm'n:*

> [A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977). Applying this test, Judge Pieras decided, first, that "the record before the Court, including the stipulations of the parties, reveals that any member of [the Cable Association] could have brought this action and would have alleged a particularized harm sufficient to give that member standing." 698 F.Supp. at 414. He next found that the organizational purposes of the Association had been sufficiently pled, and "that these avowed purposes are consonant with the relief requested and the interest sought to be protected in the suit." *Id.* Third, he decided that "[t]he claim asserted and the relief requested, at this stage of the litigation, do not require the participation of the individual [Association] members," and that "the relief requested here runs to all [Association] members equally: protection from local prosecution. No individualized evidence is required." *Id.* The defendants challenge the district court's determination on all three elements of the *Hunt* test.

First, the defendants note that this suit no longer contains a challenge to the constitutionality of Puerto Rico's obscenity statute; only the statutory preemption claim remains. The defendants then argue that Teleponce is the only member of the Cable Association claiming to have designated a channel for commercial use under § 532, so it is the only member which can assert an immunity from prosecution based on § 558. Without disputing that Teleponce itself would have had standing to sue, they argue that the prospective standing of a single member cannot support standing for the Cable Association to sue on behalf of its members.

We think the defendants' assertion that, because other members have not yet designated a leased access channel they lack standing, confuses merits and standing. Certainly, the members of the Association who have dropped transmission of the Playboy Channel on account of threats of prosecution have suffered an injury directly traceable to the defendants' actions, *see Valley Forge College v. Americans United,* 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982); whether or not they are entitled to the protection from prosecution offered by § 558 is part of the merits of their claim, not their standing to sue. In any event, the Supreme Court has never required that *every* member of an association have standing before it can sue on behalf of its members. "The association must allege that its members, *or any one of them,* are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit." *Warth v. Seldin,* 422 U.S. 490, 511, 95 S.Ct. 2197, 2212, 45 L.Ed.2d 343 (1975) (emphasis added) (citing *Sierra Club v. Morton,* 405 U.S. 727, 734–35, 92 S.Ct. 1361, 1366, 31 L.Ed.2d 636 (1972), which held that the Sierra Club lacked standing to challenge the U.S. Forest Service's approval of development in the Mineral King Valley because the Club didn't allege that any of its members use the area for recreation). In *Automobile Workers v. Brock,* the Court held that the first element of the *Hunt* test was met when the plaintiff association showed that "at least some" of its members would have had standing to sue on their own. 477 U.S. 274, 286, 106 S.Ct. 2523, 2530, 91 L.Ed.2d 228 (1986). Teleponce's prospective standing is enough to satisfy the first element of *Hunt.*

Next, the defendants claim that in reality, the Cable Association is just an "empty husk of an association with no public identity" which is controlled by PEI for its own interests, not the interests of the members. The record does not support this accusation.

The record evidence shows that the Cable Association was organized prior to the filing of this suit, and for different reasons, Appellants' Appendix (AA) at 57; that the members of the Association twice unanimously consented to the Association's participation in the suit (one member later demurring), *Id.* at 58; and that PEI does not own or control the Cable Association, or any of its members. SA at 72. The defendants point out that PEI is bearing the expense of this litigation, but this doesn't show that the Association is a pawn of PEI or that it is not representing its members' true interest. If the members felt their interests were not being served by this suit, they could vote to end the Association's involvement.

A more difficult question is posed by the third prerequisite for an association to sue on behalf of its members: that "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." The defendants argue that because this lawsuit requires the participation of Teleponce, the Association lacks standing.

We can easily find that the plaintiffs' request for *declaratory* relief—that the Cable Act prevents local prosecution of cable operators for programing transmitted over leased access channels—does not require any individual member's participation as a party. Such declaratory relief turns on a question of law which is not particular to each member of the Association, and because the declaration applies equally to all members of the Association, there is no need for individual proof or participation. *Brock*, 477 U.S. at 287, 106 S.Ct. at 2531 (no need for members' participation when suit raises a "pure question of law" not individual to members, even though later proceedings might require individualized consideration). The same is true for injunctive relief which parallels the declaration. Although not every member may derive any immediate benefit from the injunction, no individual findings are necessary, and "it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured." *Warth*, 422 U.S. at 515,

95 S.Ct. at 2213. *See Camel Hair and Cashmere v. Associated Dry Goods*, 799 F.2d 6, 12 (1st Cir.1986).

A different part of the claim asserted does depend upon proof which may vary from member to member, however. The complaint asked the district court to *enjoin* the defendant from prosecuting or threatening to prosecute "cable operators" generally. This claim is now solely based upon the immunity from prosecution found in § 558. The district court made an individualized determination when it declared that Teleponce carries the Playboy Channel pursuant to § 532. 698 F.Supp. at 419. This declaration was based upon the court's review of communications between PEI and Teleponce, evidence which could not have established whether any other member of the Association had similarly designated a channel for leased access. *Id.* at 416–18.

But just because a claim may require proof specific to individual members of an association does not mean the members are required to participate *as parties* in the lawsuit. In *Warth*, the Supreme Court held that an association had no standing to sue on behalf of its members, when seeking monetary relief to compensate its members' injuries. The Court said

> whatever injury may have been suffered is peculiar to the individual member concerned, and both the fact and extent of injury would require individualized proof. Thus, to obtain relief in damages, each member of Home Builders [Association] who claims injury as a result of respondents' practices must be a party to the suit, and Home Builders has no standing to claim damages on his behalf.

422 U.S. at 515–16, 95 S.Ct. at 2213–14. The crucial reason for *requiring* the members' participation as parties must have been so that the members could recover their own damages, should they prevail. The Home Builders Association, having alleged no injury to itself nor any assignment of damage claims by its members, was not entitled to be compensated for the various injuries suffered by its members. *Id.* at 515, 95 S.Ct. at 2213. The members' participation *as parties* was necessary so

that judgment could be entered in their favor, not in order to prove individual damages. The members could still have been called to testify as to their damages, and could have been deposed and subjected to subpoenas *duces tecum* by the defendants without being parties to the suit. Fed.R. Civ.P. 30 & 45.

We see no reason why the claim for injunctive relief in this case *requires* the participation of any Cable Association member, or how Teleponce's participation as a party would make any significant difference. No monetary judgment was granted, either on behalf of the Cable Association or its members.[10] The defendants do not claim that because Teleponce is not a plaintiff, they have been unable to gain access to evidence concerning the single individual issue, whether or not Teleponce has designated for commercial use the channel over which it transmits the Playboy Channel. The defendants, in fact, agreed to submit the case for decision on summary judgment without claiming there was a genuine issue of fact, only contesting the evidence the court could consider in resolving this issue. Therefore, we hold that the district court did not err in finding that Cable Association has standing to bring this suit on behalf of its members.

### B. PEI

■ PEI faces a different standing test from the Cable Association, since it does not claim to be suing on behalf of the cable operators. To have standing, PEI must first satisfy what faces all parties bringing suit in federal court—Article III's limitation of federal court jurisdiction to the resolution of "Cases" or "Controversies." PEI must show (1) an actual or threatened injury suffered as a result of the putatively illegal conduct of the defendants, (2) that its injury "fairly can be traced to the challenged action," and (3) that this injury is likely to find redress in a favorable decision. *Valley Forge College*, 454 U.S. at 472, 102 S.Ct. at 758.

The defendants' brief does not challenge PEI's standing under Article III, except perhaps with an oblique statement which might be read to question whether the remedy sought will benefit PEI: the defendants claim "the Playboy plaintiffs would not derive any direct benefit from [this] action, since Section 558 does not afford them any shield from obscenity prosecution." Appellants' Brief at 13. The plaintiffs' complaint alleges that PEI loses money and suffers intangible losses when cable operators stop transmitting the Playboy Channel, and that cable operators will drop the Playboy Channel rather than face an obscenity prosecution. SA at 13, 19. The parties have stipulated that Teleponce had a reasonable fear of such prosecution. *Id.* at 60. Regardless of whether PEI may later face its own obscenity prosecution, an injunction against prosecution of Teleponce will effectively remove an imminent financial threat to PEI. Article III does not prevent the court from addressing PEI's claim.

■ What the defendants *do* challenge at length is what they characterize as PEI's basing a suit entirely on the legal right of a third person. This invokes the prudential, discretionary limit federal courts have imposed on their exercise of Article III powers—the rule against *jus tertii* standing. A plaintiff generally must assert its own legal rights, without resting its claim for relief on the rights of third parties. *Secretary of State of Md. v. J.H. Munson Co.*, 467 U.S. 947, 955, 104 S.Ct. 2839, 2846, 81 L.Ed.2d 786 (1984); *Warth*, 422 U.S. at 499, 95 S.Ct. at 772. *See generally*, H. Monaghan, Third Party Standing, 84 Colum.Law Rev. 277 (1984).

PEI, as did the district court, relies on *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963), as an answer to this problem. In *Bantam Books*, four out-of-state book publishers sued to enjoin the actions of Rhode Island's Commission to Encourage Morality in Youth, claiming that the Commission's noti-

---

**10.** The plaintiffs' damage claims have been held in abeyance, and are not before us. We express no opinion on the Association's standing to pursue these claims on behalf of itself or its members.

fication to local distributors that it found certain of the publisher's books to be "objectionable" violated the First Amendment and was causing the publishers economic harm. The Court recognized the publishers' right to sue even though none of the Commission's actions were directed toward them. *Id.* at 64–65 n. 6, 83 S.Ct. at 636–37 n. 6. PEI analogizes itself to the publishers and Teleponce to the distributors, claiming that *Bantam Books* establishes its standing.

*Bantam Books* alone cannot support PEI's claim of standing. The Supreme Court plainly stated that the publishers in *Bantam Books* were asserting their *own* first amendment rights, not the distributors':

> "[A]ppellants are not in the position of mere proxies arguing another's constitutional rights. The constitutional guarantee of freedom of the press embraces the circulation of books as well as their publication, and the direct and obviously intended result of the Commission's activities was to curtail the circulation in Rhode Island of books published by the appellants."

*Id.* (citations omitted). At this point in its suit, PEI is not asserting the first amendment rights of anyone. PEI does not claim, although perhaps it could, that threats to prosecute a cable operator under an obscenity statute which is effectively preempted by federal law violates its own first amendment rights. Its claim for relief now depends entirely upon the immunity from prosecution provided by the Cable Act. The defendants argue that this immunity is personal to the cable operator, and does not and is not intended to benefit the cable programmer.

The rule against *jus tertii* standing is not absolute. The Supreme Court has recognized the ability of plaintiffs to raise the rights of others in many cases. "[T]here are situations where competing considera-

tions outweigh any prudential rationale against third-party standing, and ... this Court has relaxed the prudential-standing limitation when such concerns are present." *J.H. Munson Co.*, 467 U.S. at 956, 104 S.Ct. at 2846. When a special relationship exists between the plaintiff and the third party whose rights are allegedly infringed, so that the infringement of the third parties' rights restricts the plaintiff's own rights, *jus tertii* standing may be appropriate. *E.g., Caplin & Drysdale, Chartered v. United States,* — U.S. —, 109 S.Ct. 2646, 2651 n. 3, 105 L.Ed.2d 528 (1989); *Eisenstadt v. Baird,* 405 U.S. 438, 443–46, 92 S.Ct. 1029, 1033–35, 31 L.Ed.2d 349 (1972). Also,

> Where practical obstacles prevent a party from asserting rights on behalf of itself, for example, the Court has recognized the doctrine of *jus tertii* standing. In such a situation, the Court considers whether the third party has sufficient injury-in-fact to satisfy the Art. III case-or-controversy requirement, and whether, as a prudential matter, the third party can reasonably be expected properly to frame the issues and present them with the necessary adversarial zeal. *See, e.g., Craig v. Boren,* 429 U.S. 190, 193–194 [97 S.Ct. 451, 454–55, 50 L.Ed.2d 397] (1976).

*J.H. Munson Co.*, 467 U.S. at 956, 104 S.Ct. at 2846. Both of these considerations are present here.

First, there is a unique, reciprocal relationship between the cable operator's statutory immunity, upon which PEI bases its suit, and PEI's own statutory right to mandatory access. Narrowly viewed, of course, § 558 protects only cable operators from liability, not programmers like PEI. Nevertheless, the cable operator's immunity benefits the leased access programmer in a very real sense—by helping guarantee its statutory right to access part of the operator's channel capacity.[11]

---

11. Of course, PEI has no right of access to transmit obscenity, and the Cable Act expressly retains and provides for liability for programmers who transmit obscenity. 47 U.S.C. § 558; 559. PEI stoutly asserts that the Playboy Channel is not obscene, however, and the trans-

missions are presumed protected until proven otherwise. Plaintiff Playboy Distribution Company has agreed to submit to personal jurisdiction in a prosecution for violation of Puerto Rico obscenity statutes, an action which apparently has not yet been brought.

Congress provided for compelled access in order "to assure that cable systems provide the widest possible diversity of information services and sources to the public, consistent with the First Amendment's goal of a robust marketplace of ideas. ..." House Rep. 84–934 at 19; 1984 U.S.Code and Admin.News at 4656. *See* 47 U.S.C. § 532(a). Congress also recognized that a necessary concomitant to forced access and loss of editorial control is the cable operator's immunity from liability. *Id.* at 95; 1984 U.S.Code and Admin.News at 4732. (The defendants seem to concede that this immunity is essential to effectuate the mandatory access provision. Appellants' Brief at 44.) Without this protection, cable operators would face a legislatively-mandated, undeterminable exposure to both civil and criminal liability. Faced with such a threat, operators would likely resist any forced access, either by colluding with unobjectionable, safe programmers to fill up the required percentage of mandatory access channels, or by avoiding being subject to forced access by maintaining less than thirty-six activated channels. This would defeat the basic purpose of the mandatory access provisions by encouraging cable operators to maintain their monopoly power over the content of programming transmitted. With the immunity in place, however, the cable programmer's access is more secure, since it removes a strong incentive not to grant access. Prosecuting, or threatening to prosecute a cable operator for the content of leased access channel programming despite the immunity poses the same threat to the programmer's right to compelled access as if there was no statutory immunity in the first place.

Second, the plaintiffs' complaint alleges that cable operators will drop their carriage of the Playboy Channel rather than defend an obscenity prosecution. *J.H. Munson Co.* recognized that when the individuals who are engaging in allegedly protected activity are reluctant to raise their own rights in the face of threatened official sanctions, this presents a practical obstacle which permits third party standing. 467 U.S. at 956, 104 S.Ct. at 2846.

We see no reason to think that PEI is not an effective advocate of the cable operator's rights. Unlike the plaintiff in *Friedman v. Harold,* 638 F.2d 262 (1st Cir.1981), who sought to assert the right of a third party to the actual detriment of the rightholder, PEI's assertion of the § 558 immunity is in the cable operator's interest. *See American Library Ass'n v. Odom,* 818 F.2d 81 (D.C.1987) (plaintiff researchers who failed to show community of interests between themselves and library could not assert library's property rights). The community of interests between the operators and PEI in this suit is shown by the Cable Association's presence as co-plaintiff, and the operators' assent to the Association's participation as their representative.

Finally, although the defendants do not make an issue of it, we note that the Cable Act does provide a cause of action in favor of persons aggrieved by the failure or refusal of a cable operator to make channel capacity available according to § 532.[12] It is arguable that cable programmers should be required to use this remedy to vindicate their right of access, rather than basing a § 1983 suit on the statutory immunity of the cable operators. However, the Cable Act's legislative history indicates that Congress included § 532(d) & (e) to prevent cable operators, who might naturally be reluctant to provide leased access capacity,

---

12. Section 532(d) provides that

Any person aggrieved by the failure or refusal of a cable operator to make channel capacity available for use pursuant to this section may bring an action in the district court of the United States for the judicial district in which the cable system is located to compel that such capacity be made available. If the court finds that the channel capacity sought by such person has not been made available in accordance with this section, or finds that the price, terms, or conditions established by the cable

operator are unreasonable, the court may order such system to make available to such person the channel capacity sought, and further determine the appropriate price, terms or conditions for such use consistent with subsection (c) of this section, and may award actual damages if it deems such relief appropriate. In any such action, the court shall not consider any price, term, or condition established between an operator and an affiliate for comparable services.

from frustrating the leased access provision through subterfuge. House Rep. 84–934 at 50, 54–55; 1984 U.S.Code and Admin.News at 4687, 4691–92. Nowhere in its discussion of these provisions does the House Report address the threat to the goals of the leased access provision which can be posed from outside parties such as state enforcement agencies.

At this point, the question of standing and the previously considered question of the availability of § 1983 relief become quite close. As noted in Section III above, when a federal provision which·creates a right at the same time provides a means for vindicating that right, Congress may have intended to preclude resort to § 1983. However, because the remedy created by § 532(d) & (e) protects the cable programmer's right of access against the cable operator, but does not protect the operator's § 558 immunity from prosecution by outside parties, it is not the "comprehensive remedial scheme" which might show a legislative intent to make § 1983 unavailable. *See, e.g., Chapman,* 441 U.S. at 612–20, 99 S.Ct. at 1913–17. Like the district court, *see* 698 F.Supp. at 410–11, we find no indication that Congress intended § 532(d) & (e) to be the programmer's sole means of recourse when its right to access is threatened. Since PEI's § 1983 suit against the defendants is not inconsistent with the scope or purpose of the right of action granted it against cable operators, we see no reason to restrict PEI to that remedy.

In summary, then, because the threat to the cable operator's immunity posed by local prosecution also threatens PEI's statutory right of access, and because PEI has

alleged a reluctance on the part of the operators to defend their rights based on their statutory immunity, PEI has standing to raise the cable operator's immunity.[13]

### V. The Evidence of an Oral Designation Pursuant to § 532

■ In support of their motion for summary judgment, the plaintiffs submitted to the district court a statement of facts they claimed were not in dispute. In it, the plaintiffs claimed that in April of 1987, Teleponce received from PEI's counsel an oral request for commercial access to the channel over which the Playboy Channel was being transmitted pursuant to § 532. The Plaintiffs further claimed that Teleponce orally agreed to this request, and orally designated the channel on which the Playboy Channel is transmitted as a leased access channel. SA at 174. This allegation was supported by a letter from PEI to Teleponce, dated July 22, 1987, confirming the agreement, an affirmation of Mr. Gonzalez, and by the Association's response to interrogatories. SA 90–91, 167–68. In their "Opposition to Statement of Material Facts" submitted with their summary judgment motion, the defendants stated that they "did not accept as uncontroverted" this allegation of fact because it was supported by "hearsay evidence which could not be admissible at trial," citing *Walling v. Fairmont Creamery Co.,* 139 F.2d 318 (8th Cir.1943). Addendum D to Appellants' Brief at 1. The district court nonetheless went ahead and considered as true the plaintiffs' affirmations about the oral agreement between Teleponce and PEI, when finding that § 558 preempted prose-

---

**13.** A question could be raised whether this case even presents a third party standing issue. Prosecution of cable operators in spite of the immunity created by § 558 effectively restricts PEI's statutory right of access, so why isn't PEI actually suing to protect its *own* right? Professor Monaghan has noted that "many jus tertii claims might be understood to involve the litigant's own rights, not those of third persons, even though the impact of the [state action] on third persons must be considered in order to adjudicate the litigant's own claims." Monaghan, Third Party Standing, 84 Colum.Law Rev. at 297. He argues that when a third party's rights are threatened in a manner that impairs

its interaction with the plaintiff or "first" party, the first party may assert, as its own, the right to be free from the interference. *Id.* at 303. He argues that "a litigant asserts his own rights (not those of a third person) when he seeks to avoid restrictions that directly impair his freedom to interact with a third person who himself could not be legally prevented from engaging in the interaction." *Id.* at 299–301. This analysis strongly suggests that when a third party's right or immunity directly benefits the party claiming standing, that party has standing to sue on its own behalf, and need not establish an exception to the *jus tertii* prohibition. *See also* Hart and Wechsler's at 174 & n. 7.

cution of Teleponce because it had designated the relevant channel under § 532 or other similar arrangement. 698 F.Supp. at 418.

The defendants argue on appeal that the district court erred in concluding on summary judgment that Teleponce transmits the Playboy Channel over a channel obtained under § 532. While the defendants refer to their earlier objection in the district court, this objection is not the basis for their present argument. Instead, they now argue that there was a genuine issue of fact as to the truth of PEI's evidence, and so the district court should not have relied on that evidence in granting summary judgment.

When one party has properly supported a motion for summary judgment, the opposing party must "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (quoting *First Nat. Bank v. Cities Service*, 391 U.S. 253, 288–89, 88 S.Ct. 1575, 1592, 20 L.Ed.2d 569 (1968)). The defendants did not submit any evidence which contradicted the plaintiffs' proof. However, they argue that, based on surrounding circumstances of the affirmations, the affirmations which support PEI's claim of an oral modification are not credible.

We may assume that in a proper case, an opponent of summary judgment can show a genuine issue of material fact without introducing evidence in direct contradiction to a fact presented by the movant, but by showing the existence of specific facts which would give a reasonable jury cause to disbelieve assertions supporting the movant's version. *See* J. Moore and J. Wicker, 6A *Moore's Federal Practice* 56.-15[4] at 56–298–99 (1988); C. Wright, A. Miller, M. Kane, 10A *Federal Practice & Procedure* § 2726 (1990 Supp.). *Cf. Nat. Union Fire Ins. Co., Etc. v. Argonaut Ins. Co.*, 701 F.2d 95, 97 (9th Cir.1983) ("[N]either a desire to cross-examine an affiant nor an unspecified hope of undermining his or her credibility suffices to avert summary judgment."); *Soar v. National Football League Players' Association*, 550 F.2d 1287, 1289 n. 4 (1st Cir.1977) ("A court is not obliged to deny an otherwise persuasive motion for summary judgment 'on the basis of a vague supposition that something might turn up at the trial,'" (quoting *Lundeen v. Cordner*, 354 F.2d 401, 408 (8th Cir.1966))).

We need not, however, decide defendants' present challenge to the credibility of the assertions of oral modification presented by plaintiffs, because they made no such point before the district court. The defendants objected to the district court's reliance on the assertions of an oral modification only on the ground that they would be inadmissible at trial as hearsay. They have not pressed this argument on appeal, but instead raise a different one not presented to the district court. Issues not raised before the trial court are waived on appeal, *Cookish v. Cunningham*, 787 F.2d 1, 6 (1st Cir.1986) (*per curiam*), absent unusual circumstances or plain error suggesting that a "clear miscarriage of justice" has occurred. *Brown v. Trustees of Boston University*, 891 F.2d 337, 359 (1st Cir.1989); *Gay v. P.K. Lindsay Co., Inc.*, 666 F.2d 710, 712 n. 1 (1st Cir.1981), *cert. denied*, 456 U.S. 975, 102 S.Ct. 2240, 72 L.Ed.2d 849 (1982). The defendants do not say why this issue could not have been raised before the trial court, and we perceive no miscarriage of justice in the district court's consideration of the plaintiffs' affirmations.

Even if the defendants had not waived this issue by failing to raise it before Judge Pieras, they waived it by raising it too late on appeal. The defendants only got around to challenging the credibility of the plaintiffs' affirmations in their reply brief. An appellant waives any issue which it does not adequately raise in its initial brief, because in "preparing briefs and arguments, an appellee is entitled to rely on the content of an appellant's brief for the scope of the issues appealed." *Pignons S.A. de Mecanique v. Polaroid Corp.*, 701 F.2d 1, 3 (1st Cir.1983) (citations omitted). *Accord Wells Real Estate v. Greater Lowell Bd. of Realtors*, 850 F.2d 803, 811 (1st Cir.), *cert. denied*, 488 U.S. 955, 109 S.Ct. 392, 102

L.Ed.2d 381 (1988). We realize that the appellees voluntarily responded to this newly-raised issue in a "surreply" brief which we granted leave to file. However, in order not to encourage endless rounds of briefing, we still find the issue waived. *See Gold v. Wolpert,* 876 F.2d 1327, 1331 (7th Cir.1989).

## VI. The Breadth of the Injunction

 Ruling for the plaintiffs, Judge Pieras entered a declaratory judgment which stated that Teleponce carries the Playboy Channel over a leased access channel, and that prosecution of it, and of other members of the Association who might later designate channels pursuant to § 532, is preempted by § 558. He also enjoined the defendants (and their agents, employees, successors and persons in concert with them) from initiating prosecution against *any* member of the Cable Association based upon *any* video programming carried on the Playboy Channel. An injunction of this breadth was agreed to by the parties as to transmission prior to June 3, 1987, the date of the agreed order. As to transmissions on or after that date, the injunction must be limited to prosecution for transmission on any channel obtained under 47 U.S.C. § 532.

## VII. Conclusion

The district court had federal question jurisdiction over plaintiffs' § 1983 action. Plaintiff Cable Association has standing to bring this suit on behalf of its members, and plaintiff PEI has standing to assert the statutory immunity from prosecution of cable operators who carry the Playboy Channel over a leased access channel. The defendants have waived any objection to the district court's reliance on the plaintiffs' submitted evidence of an oral agreement between PEI and Teleponce to carry the Playboy Channel over a channel designated pursuant to § 532. The injunction against initiating prosecutions is modified so that as to video programming carried on or after June 3, 1987, the injunction is limited to transmissions on any channel obtained under 47 U.S.C. § 532 or under similar arrangements, and as so modified the entire judgment appealed from is AFFIRMED.